67 N.J. 151 (1975)
336 A.2d 713
SOUTHERN BURLINGTON COUNTY N.A.A.C.P., CAMDEN COUNTY C.O.R.E., CAMDEN COUNTY N.A.A.C.P., GLADYS CLARK, BETTY WEAL AND ANGEL PEREZ, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, AND ETHEL LAWRENCE, THOMASINE LAWRENCE, CATHERINE STILL, MARY E. SMITH, SHIRLEY MORRIS AND JACQUELINE CUSTIS, PLAINTIFFS-RESPONDENTS,
v.
TOWNSHIP OF MOUNT LAUREL, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
The Supreme Court of New Jersey.
Argued January 8, 1974.
Decided March 24, 1975.
*157 Mr. John W. Trimble argued the cause for defendant-appellant and cross-respondent (Messrs. Higgins, Trimble & Master, attorneys; Mr. Peter R. Thorndike, on the brief).
Mr. Carl S. Bisgaier, of Camden Regional Legal Services, Inc., argued the cause for plaintiffs-respondents and cross-appellants (Mr. Kenneth E. Meiser and Mr. Peter J. O'Connor, on the brief).
Mr. Norman Williams, Jr. argued the cause for amicus curiae The Public Interest Research Group of New Jersey.
Mr. Melville D. Miller, Jr. argued the cause for amicus curiae Legal Services Housing Task Force, New Jersey State Office of Legal Services.
The opinion of the Court was delivered by HALL, J.
This case attacks the system of land use regulation by defendant Township of Mount Laurel on the ground that low and moderate income families are thereby unlawfully excluded from the municipality. The trial court so found, 119 N.J. Super. 164 (Law Div. 1972), and declared the township zoning ordinance totally invalid. Its judgment went on, in line with the requests for affirmative relief, to order the municipality to make studies of the housing needs of low and moderate income persons presently or formerly residing in the community in substandard housing, as well as those in such income classifications presently employed in the township and living elsewhere or reasonably expected to be employed therein in the future, and to present a plan of affirmative public action designed "to enable *158 and encourage the satisfaction of the indicated needs." Jurisdiction was retained for judicial consideration and approval of such a plan and for the entry of a final order requiring its implementation.
The township appealed to the Appellate Division and those plaintiffs, not present or former residents, cross-appealed on the basis that the judgment should have directed that the prescribed plan take into account as well a fair share of the regional housing needs of low and moderate income families without limitation to those having past, present or prospective connection with the township. The appeals were certified on our own motion before argument in the Division. R. 2:12-1.[1]
The implications of the issue presented are indeed broad and far-reaching, extending much beyond these particular plaintiffs and the boundaries of this particular municipality.
There is not the slightest doubt that New Jersey has been, and continues to be, faced with a desperate need for housing, especially of decent living accommodations economically suitable for low and moderate income families.[2] The situation *159 was characterized as a "crisis" and fully explored and documented by Governor Cahill in two special messages to the Legislature  A Blueprint for Housing in New Jersey (1970) and New Horizons in Housing (1972).
Plaintiffs represent the minority group poor (black and Hispanic)[3] seeking such quarters. But they are not the only category of persons barred from so many municipalities by reason of restrictive land use regulations. We have reference to young and elderly couples, single persons and large, growing families not in the poverty class, but who still cannot afford the only kinds of housing realistically permitted in most places  relatively high-priced, single-family detached dwellings on sizeable lots and, in some municipalities, expensive apartments. We will, therefore, consider the case from the wider viewpoint that the effect of Mount Laurel's land use regulation has been to prevent various categories of persons from living in the township because of the limited extent of their income and resources. In this connection, we accept the representation of the municipality's counsel at oral argument that the regulatory scheme was not adopted with any desire or intent to exclude prospective residents on the obviously illegal basis of race, origin or believed social incompatibility.
*160 As already intimated, the issue here is not confined to Mount Laurel. The same question arises with respect to any number of other municipalities of sizeable land area outside the central cities and older built-up suburbs of our North and South Jersey metropolitan areas (and surrounding some of the smaller cities outside those areas as well) which, like Mount Laurel, have substantially shed rural characteristics and have undergone great population increase since World War II, or are now in the process of doing so, but still are not completely developed and remain in the path of inevitable future residential, commercial and industrial demand and growth. Most such municipalities, with but relatively insignificant variation in details, present generally comparable physical situations, courses of municipal policies, practices, enactments and results and human, governmental and legal problems arising therefrom. It is in the context of communities now of this type or which become so in the future, rather than with central cities or older built-up suburbs or areas still rural and likely to continue to be for some time yet, that we deal with the question raised.
Extensive oral and documentary evidence was introduced at the trial, largely informational, dealing with the development of Mount Laurel, including the nature and effect of municipal regulation, the details of the region of which it is a part and the recent history thereof, and some of the basics of housing, special reference being directed to that for low and moderate income families. The record has been supplemented by figures, maps, studies and literature furnished or referred to by counsel and the amici, so that the court has a clear picture of land use regulation and its effects in the developing municipalities of the state.
This evidence was not contradicted by the township, except in a few unimportant details. Its candid position is that, conceding its land use regulation was intended to result and has resulted in economic discrimination and exclusion *161 of substantial segments of the area population, its policies and practices are in the best present and future fiscal interest of the municipality and its inhabitants and are legally permissible and justified. It further asserts that the trial court was without power to direct the affirmative relief it did.

I

The Facts
Mount Laurel is a flat, sprawling township, 22 square miles, or about 14,000 acres, in area, on the west central edge of Burlngton County. It is roughly triangular in shape, with its base, approximately eight miles long, extending in a northeasterly-southwesterly direction roughly parallel with and a few miles east of the Delaware River. Part of its southerly side abuts Cherry Hill in Camden County. That section of the township is about seven miles from the boundary line of the city of Camden and not more than 10 miles from the Benjamin Franklin Bridge crossing the river to Philadelphia.
In 1950, the township had a population of 2817, only about 600 more people than it had in 1940. It was then, as it had been for decades, primarily a rural agricultural area with no sizeable settlements or commercial or industrial enterprises. The populace generally lived in individual houses scattered along country roads. There were several pockets of poverty, with deteriorating or dilapidated housing (apparently 300 or so units of which remain today in equally poor condition). After 1950, as in so many other municipalities similarly situated, residential development and some commerce and industry began to come in. By 1960 the population had almost doubled to 5249 and by 1970 had more than doubled again to 11,221. These new residents were, of course, "outsiders" from the nearby central cities and older suburbs or from more distant places drawn *162 here by reason of employment in the region. The township is now definitely a part of the outer ring of the South Jersey metropolitan area, which area we define as those portions of Camden, Burlington and Gloucester Counties within a semicircle having a radius of 20 miles or so from the heart of Camden city. And 65% of the township is still vacant land or in agricultural use.
The growth of the township has been spurred by the construction or improvement of main highways through or near it. The New Jersey Turnpike, and now route I-295, a freeway paralleling the turnpike, traverse the municipality near its base, with the main Camden-Philadelphia turnpike interchange at the corner nearest Camden. State route 73 runs at right angles to the turnpike at the interchange and route 38 slices through the northeasterly section. Routes 70 and U.S. 130 are not far away. This highway network gives the township a most strategic location from the standpoint of transport of goods and people by truck and private car. There is no other means of transportation.
The location and nature of development has been, as usual, controlled by the local zoning enactments. The general ordinance presently in force, which was declared invalid by the trial court, was adopted in 1964. We understand that earlier enactments provided, however, basically the same scheme but were less restrictive as to residential development. The growth pattern dictated by the ordinance is typical.
Under the present ordinance, 29.2% of all the land in the township, or 4,121 acres, is zoned for industry. This amounts to 2,800 more acres than were so zoned by the 1954 ordinance. The industrial districts comprise most of the land on both sides of the turnpike and routes I-295, 73 and 38. Only industry meeting specified performance standards is permitted. The effect is to limit the use substantially to light manufacturing, research, distribution of goods, offices and the like. Some non-industrial uses, such as agriculture, *163 farm dwellings, motels, a harness racetrack, and certain retail sales and service establishments, are permitted in this zone. At the time of trial no more than 100 acres, mostly in the southwesterly corner along route 73 adjacent to the turnpike and I-295 interchanges, were actually occupied by industrial uses. They had been constructed in recent years, mostly in several industrial parks, and involved tax ratables of about 16 million dollars. The rest of the land so zoned has remained undeveloped. If it were fully utilized, the testimony was that about 43,500 industrial jobs would be created, but it appeared clear that, as happens in the case of so many municipalities, much more land has been so zoned than the reasonable potential for industrial movement or expansion warrants. At the same time, however, the land cannot be used for residential development under the general ordinance.
The amount of land zoned for retail business use under the general ordinance is relatively small  169 acres, or 1.2% of the total. Some of it is near the turnpike interchange; most of the rest is allocated to a handful of neighborhood commercial districts. While the greater part of the land so zoned appears to be in use, there is no major shopping center or concentrated retail commercial area  "downtown"  in the township.
The balance of the land area, almost 10,000 acres, has been developed until recently in the conventional form of major subdivisions. The general ordinance provides for four residential zones, designated R-1, R-1D, R-2 and R-3. All permit only single-family, detached dwellings, one house per lot  the usual form of grid development. Attached town-houses, apartments (except on farms for agricultural workers) and mobile homes are not allowed anywhere in the township under the general ordinance. This dwelling development, resulting in the previously mentioned quadrupling of the population, has been largely confined to the R-1 and R-2 districts in two sections  the northeasterly and southwesterly corners adjacent to the turnpike and other major highways. The result has been quite intensive development of these sections, *164 but at a low density. The dwellings are substantial; the average value in 1971 was $32,500 and is undoubtedly much higher today.
The general ordinance requirements, while not as restrictive as those in many similar municipalities, nonetheless realistically allow only homes within the financial reach of persons of at least middle income. The R-1 zone requires a minimum lot area of 9,375 square feet, minimum lot width of 75 feet at the building line, and a minimum dwelling floor area of 1,100 square feet if a one-story building and 1,300 square feet if one and one-half stories or higher. Originally this zone comprised about 2,500 acres. Most of the subdivisions have been constructed within it so that only a few hundred acres remain (the testimony was at variance as to the exact amount). The R-2 zone, comprising a single district of 141 acres in the northeasterly corner, has been completely developed. While it only required a minimum floor area of 900 square feet for a one-story dwelling, the minimum lot size was 11,000 square feet; otherwise the requisites were the same as in the R-1 zone.
The general ordinance places the remainder of the township, outside of the industrial and commercial zones and the R-1D district (to be mentioned shortly), in the R-3 zone. This zone comprises over 7,000 acres  slightly more than half of the total municipal area  practically all of which is located in the central part of the township extending southeasterly to the apex of the triangle. The testimony was that about 4,600 acres of it then remained available for housing development. Ordinance requirements are substantially higher, however, in that the minimum lot size is increased to about one-half acre (20,000 square feet). (We understand that sewer and water utilities have not generally been installed, but, of course, they can be.) Lot width at the building line must be 100 feet. Minimum dwelling floor area is as in the R-1 zone. Presently this section is primarily in agricultural use; it contains as well most of the municipality's substandard housing.
*165 The R-1D district was created by ordinance amendment in 1968. The area is composed of a piece of what was formerly R-3 land in the western part of that zone. The district is a so-called "cluster" zone. See generally 2 Williams, American Planning Law: Land Use and the Police Power, §§ 47.01-47.05 (1974). That writer defines the concept as follows:
* * * Under the usual cluster-zoning provisions, both the size and the width of individual residential lots in a large (or medium-sized) development may be reduced, provided (usually) that the overall density of the entire tract remains constant  provided, that is, that an area equivalent to the total of the areas thus "saved" from each individual lot is pooled and retained as common open space. The most obvious advantages include a better use of many sites, and relief from the monotony of continuous development. § 47.01, pp. 212-213.
Here this concept is implemented by reduction of the minimum lot area from 20,000 square feet required in the R-3 zone to 10,000 square feet (12,000 square feet for corner lots) but with the proviso that one-family houses  the single permitted dwelling use  "shall not be erected in excess of an allowable development density of 2.25 dwelling units per gross acre." The minimum lot width at the building line must be 80 feet and the minimum dwelling floor area is the same as in the R-3 zone. The amendment further provides that the developer must set aside and dedicate to the municipality a minimum of 15% and a maximum of 25% of the total acreage for such public uses as may be required by the Planning Board, including "but not limited to school sites, parks, playgrounds, recreation areas, public buildings, public utilities." Some dwelling development has taken place in this district, the exact extent of which is not disclosed by the record. It is apparent that the dwellings are comparable in character and value to those in the other residential zones. The testimony was that 486 acres remained available in the district.[4]
*166 A variation from conventional development has recently occurred in some parts of Mount Laurel, as in a number of other similar municipalities, by use of the land use regulation device known as "planned unit development" (PUD). This scheme differs from the traditional in that the type, density and placement of land uses and buildings, instead of being detailed and confined to specified districts by local legislation in advance, is determined by contract, or "deal," as to each development between the developer and the municipal administrative authority, under broad guidelines laid down by state enabling legislation and an implementing local ordinance. The stress is on regulation of density and permitted mixture of uses within the same area, including various kinds of living accommodations with or without commercial and industrial enterprises. The idea may be basically thought of as the creation of "new towns" in virgin territory, full-blown or in miniature, although most frequently the concept has been limited in practice, as in Mount Laurel, to residential developments of various sizes having some variety of housing and perhaps some retail establishments to serve the inhabitants. See generally, 2 Williams, supra, §§ 48.01 to 48.12; cf. Cheney v. Village 2 at New Hope, Inc., 429 Pa. 626, 241 A.2d 81, 82-83 (1968).
New Jersey passed such enabling legislation in 1967 (L. 1967, c. 61, amended c. 286, N.J.S.A. 40:55-54, et seq.), which closely follows a model act found in 114 U. Pa. L. Rev. 140 (1965), and Mount Laurel adopted the implementing enactment as a supplement to its general zoning ordinance in December of that year. While the ordinance was repealed early in 1971, the township governing body in the interim had approved four PUD projects, which were specifically saved from extinction by the repealer.[5]
*167 These projects, three in the southwesterly sector and one in the northeasterly sector, are very substantial and involve at least 10,000 sale and rental housing units of various types to be erected over a period of years. Their bounds were created by agreement rather than legislative specification on the zoning map, invading industrial, R-1, R-1D, R-3 and even flood plain zones. If completed as planned, they will in themselves ultimately quadruple the 1970 township population, but still leave a good part of the township undeveloped. (The record does not indicate how far development in each of the projects has progressed.) While multi-family housing in the form of rental garden, medium rise and high rise apartments and attached townhouses is for the first time provided for, as well as single-family detached dwellings for sale, it is not designed to accommodate and is beyond the financial reach of low and moderate income families, especially those with young children. The aim is quite the contrary; as with the single-family homes in the older conventional subdivisions, only persons of medium and upper income are sought as residents.
A few details will furnish sufficient documentation. Each of the resolutions of tentative approval of the projects contains *168 a similar fact finding to the effect that the development will attract a highly educated and trained population base to support the nearby industrial parks in the township as well as the business and commercial facilities. The approvals also sharply limit the number of apartments having more than one bedroom. Further, they require that the developer must provide in its leases that no school-age children shall be permitted to occupy any one-bedroom apartment and that no more than two such children shall reside in any two-bedroom unit. The developer is also required, prior to the issuance of the first building permit, to record a covenant, running with all land on which multi-family housing is to be constructed, providing that in the event more than .3 school children per multi-family unit shall attend the township school system in any one year, the developer will pay the cost of tuition and other school expenses of all such excess numbers of children. In addition, low density, required amenities, such as central air conditioning, and specified developer contributions help to push rents and sales prices to high levels. These contributions include fire apparatus, ambulances, fire houses, and very large sums of money for educational facilities, a cultural center and the township library.[6]
Still another restrictive land use regulation was adopted by the township through a supplement to the general zoning ordinance enacted in September 1972 creating a new zone, R-4, Planned Adult Retirement Community (PARC). The supplementary enactment designated a sizeable area as the zone  perhaps 200 acres  carved out of the R-1D and R-3 districts in the southwesterly sector. The enactment recited a critical shortage of adequate housing in the township suitable "for the needs and desires of senior citizens and certain other adults over the age of 52." The permission was essentially for single ownership development of the zone for multi-family *169 housing (townhouses and apartments), thereafter to be either rented or sold as cooperatives or condominiums. The extensive development requirements detailed in the ordinance make it apparent that the scheme was not designed for, and would be beyond the means of, low and moderate income retirees. The highly restricted nature of the zone is found in the requirement that all permanent residents must be at least 52 years of age (except a spouse, immediate family member other than a child, live-in domestic, companion or nurse). Children are limited to a maximum of one, over age 18, residing with a parent and there may be no more than three permanent residents in any one dwelling unit.[7]
All this affirmative action for the benefit of certain segments of the population is in sharp contrast to the lack of action, and indeed hostility, with respect to affording any opportunity for decent housing for the township's own poor living in substandard accommodations, found largely in the section known as Springville (R-3 zone). The 1969 Master Plan Report recognized it and recommended positive action. The continuous official reaction has been rather a negative policy of waiting for dilapidated premises to be vacated and then forbidding further occupancy. An earlier non-governmental effort to improve conditions had been effectively thwarted. In 1968 a private non-profit association sought to build subsidized, multi-family housing in the Springville section with funds to be granted by a higher level governmental agency. Advance municipal approval of the project was required. The Township Committee responded with a purportedly approving resolution, which found a need for "moderate" income housing in the area, but went on to specify that such housing must be constructed subject to all zoning, planning, building and other applicable ordinances and codes. This meant single-family detached dwellings on 20,000 square foot lots. (Fear was also *170 expressed that such housing would attract low income families from outside the township.) Needless to say, such requirements killed realistic housing for this group of low and moderate income families.[8]
The record thoroughly substantiates the findings of the trial court that over the years Mount Laurel "has acted affirmatively to control development and to attract a selective type of growth" (119 N.J. Super. at 168) and that "through its zoning ordinances has exhibited economic discrimination in that the poor have been deprived of adequate housing and the opportunity to secure the construction of subsidized housing, and has used federal, state, county and local finances and resources[9] solely for the betterment of middle and upper-income persons." (119 N.J. Super. at 178).
There cannot be the slightest doubt that the reason for this course of conduct has been to keep down local taxes on property (Mount Laurel is not a high tax municipality) and that the policy was carried out without regard for nonfiscal considerations with respect to people, either within or without its boundaries. This conclusion is demonstrated not only by what was done and what happened, as we have related, but also by innumerable direct statements of municipal officials at public meetings over the years which are found *171 in the exhibits. The trial court referred to a number of them. 119 N.J. Super. at 169-170. No official testified to the contrary.
This policy of land use regulation for a fiscal end derives from New Jersey's tax structure, which has imposed on local real estate most of the cost of municipal and county government and of the primary and secondary education of the municipality's children. The latter expense is much the largest, so, basically, the fewer the school children, the lower the tax rate. Sizeable industrial and commercial ratables are eagerly sought and homes and the lots on which they are situate are required to be large enough, through minimum lot sizes and minimum floor areas, to have substantial value in order to produce greater tax revenues to meet school costs. Large families who cannot afford to buy large houses and must live in cheaper rental accommodations are definitely not wanted, so we find drastic bedroom restrictions for, or complete prohibition of, multi-family or other feasible housing for those of lesser income.
This pattern of land use regulation has been adopted for the same purpose in developing municipality after developing municipality. Almost every one acts solely in its own selfish and parochial interest and in effect builds a wall around itself to keep out those people or entities not adding favorably to the tax base, despite the location of the municipality or the demand for varied kinds of housing. There has been no effective intermunicipal or area planning or land use regulation. All of this is amply demonstrated by the evidence in this case as to Camden, Burlington and Gloucester counties. As to the similar situation generally in the state, see New Jersey Department of Community Affairs, Division of State and Regional Planning, Land Use Regulation, The Residential Land Supply (April 1972) (a study assembling and examining the nature and extent of municipal zoning practices in 16 counties as affecting residential land available for low and moderate income housing) *172 and Williams and Norman, Exclusionary Land Use Controls: The Case of North-Eastern New Jersey, 22 Syracuse L. Rev. 475, 486-487 (1971). One incongruous result is the picture of developing municipalities rendering it impossible for lower paid employees of industries they have eagerly sought and welcomed with open arms (and, in Mount Laurel's case, even some of its own lower paid municipal employees) to live in the community where they work.
The other end of the spectrum should also be mentioned because it shows the source of some of the demand for cheaper housing than the developing municipalities have permitted. Core cities were originally the location of most commerce and industry. Many of those facilities furnished employment for the unskilled and semi-skilled. These employees lived relatively near their work, so sections of cities always have housed the majority of people of low and moderate income, generally in old and deteriorating housing. Despite the municipally confined tax structure, commercial and industrial ratables generally used to supply enough revenue to provide and maintain municipal services equal or superior to those furnished in most suburban and rural areas.
The situation has become exactly the opposite since the end of World War II. Much industry and retail business, and even the professions, have left the cities. Camden is a typical example. The testimonial and documentary evidence in this case as to what has happened to that city is depressing indeed. For various reasons, it lost thousands of jobs between 1950 and 1970, including more than half of its manufacturing jobs (a reduction from 43,267 to 20,671, while all jobs in the entire area labor market increased from 94,507 to 197,037). A large segment of retail business faded away with the erection of large suburban shopping centers. The economically better situated city residents helped fill up the miles of sprawling new housing developments, not fully served by public transit. In a society which *173 came to depend more and more on expensive individual motor vehicle transportation for all purposes, low income employees very frequently could not afford to reach outlying places of suitable employment and they certainly could not afford the permissible housing near such locations. These people have great difficulty in obtaining work and have been forced to remain in housing which is overcrowded, and has become more and more substandard and less and less tax productive. There has been a consequent critical erosion of the city tax base and inability to provide the amount and quality of those governmental services  education, health, police, fire, housing and the like  so necessary to the very existence of safe and decent city life. This category of city dwellers desperately needs much better housing and living conditions than is available to them now, both in a rehabilitated city and in outlying municipalities. They make up, along with the other classes of persons earlier mentioned who also cannot afford the only generally permitted housing in the developing municipalities, the acknowledged great demand for low and moderate income housing.

II

The Legal Issue
The legal question before us, as earlier indicated, is whether a developing municipality like Mount Laurel may validly, by a system of land use regulation, make it physically and economically impossible to provide low and moderate income housing in the municipality for the various categories of persons who need and want it and thereby, as Mount Laurel has, exclude such people from living within its confines because of the limited extent of their income and resources. Necessarily implicated are the broader questions of the right of such municipalities to limit the kinds of available housing and of any obligation to make possible a variety and choice of types of living accommodations.
*174 We conclude that every such municipality must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing. More specifically, presumptively it cannot foreclose the opportunity of the classes of people mentioned for low and moderate income housing and in its regulations must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional need therefor. These obligations must be met unless the particular municipality can sustain the heavy burden of demonstrating peculiar circumstances which dictate that it should not be required so to do.[10]
We reach this conclusion under state law and so do not find it necessary to consider federal constitutional grounds urged by plaintiffs. We begin with some fundamental principles as applied to the scene before us.
Land use regulation is encompassed within the state's police power. Our constitutions have expressly so provided since an amendment in 1927. That amendment, now Art. IV, sec. VI, par. 2 of the 1947 Constitution, authorized legislative delegation of the power to municipalities (other than counties), but reserved the legislative right to repeal or alter the delegation (which we take it means repeal or alteration in whole or in part). The legislative delegation of the zoning power followed in 1928, by adoption of the standard zoning enabling act, now found, with subsequent amendments, in N.J.S.A. 40:55-30 to 51.
It is elementary theory that all police power enactments, no matter at what level of government, must conform to the basic state constitutional requirements of substantive due process and equal protection of the laws. These *175 are inherent in Art. I, par. 1 of our Constitution,[11] the requirements of which may be more demanding than those of the federal Constitution. Robinson v. Cahill, 62 N.J. 473, 482, 490-492 (1973); Washington National Insurance Co. v. Board of Review, 1 N.J. 545, 553-554 (1949). It is required that, affirmatively, a zoning regulation, like any police power enactment, must promote public health, safety, morals or the general welfare. (The last term seems broad enough to encompass the others). Conversely, a zoning enactment which is contrary to the general welfare is invalid. See generally, e.g., Roselle v. Wright, 21 N.J. 400, 409-410 (1956); Katobimar Realty Co. v. Webster, 20 N.J. 114, 122-123 (1955); Schmidt v. Board of Adjustment of Newwark, 9 N.J. 405, 413-419 (1952); Collins v. Board of Adjustment of Margate City, 3 N.J. 200, 206 (1949). Indeed these considerations are specifically set forth in the zoning enabling act as among the various purposes of zoning for which regulations must be designed. N.J.S.A. 40:55-32. Their inclusion therein really adds little; the same requirement would exist even if they were omitted. If a zoning regulation violates the enabling act in this respect, it is also theoretically invalid under the state constitution. We say "theoretically" because, as a matter of policy, we do not treat the validity of most land use ordinance provisions as involving matters of constitutional dimension; that classification is confined to major questions of fundamental import. Cf. Tidewater Oil Co. v. Mayor and Council of the Borough of Carteret, 44 N.J. 338, 343 (1965). We consider the basic importance of housing and local regulations restricting its availability to substantial segments of the population to fall within the latter category.
*176 The demarcation between the valid and the invalid in the field of land use regulation is difficult to determine, not always clear and subject to change. This was recognized almost fifty years ago in the basic case of Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926):
The ordinance now under review and all similar laws and regulations must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. (272 U.S. at 387, 47 S.Ct. at 118, 71 L.Ed. at 310).
This court has also said as much and has plainly warned, even in cases decided some years ago sanctioning a broad measure of restrictive municipal decisions, of the inevitability of change in judicial approach and view as mandated by change in the world around us. Lionshead Lake, Inc. v. Township of Wayne, 10 N.J. 165, 172-173 (1952), appeal dismissed 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953) (approving requirement of minimum floor area for dwellings, the same in all residential districts); Fischer v. Township of Bedminster, 11 N.J. 194, 205 (1952) (sanctioning minimum lot area of five acres in a then rural municipality); Pierro v. Baxendale, 20 N.J. 17, 29 (1955) (holding valid an ordinance permitting boarding and rooming houses, but not hotels and motels, in residential districts); Vickers v. Township Committee of Gloucester Township, 37 N.J. 232, 250 (1962), cert. den. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963) (sustaining ordinance provisions prohibiting mobile home parks throughout the township). The warning is perhaps best put in Pierro:
We are aware of the extensive academic discussion following the decisions in the Lionshead and Bedminster cases, supra, and the suggestion that the very broad principles which they embody may intensify dangers of economic segregation which even the more traditional modes of zoning entail * * *. In the light of existing population and land conditions within our State these [municipal zoning] *177 powers may fairly be exercised without in anywise endangering the needs or reasonable expectations of any segments of our people. If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed. (20 N.J. at 29).
The warning implicates the matter of whose general welfare must be served or not violated in the field of land use regulation. Frequently the decisions in this state, including those just cited, have spoken only in terms of the interest of the enacting municipality, so that it has been thought, at least in some quarters, that such was the only welfare requiring consideration. It is, of course, true that many cases have dealt only with regulations having little, if any, outside impact where the local decision is ordinarily entitled to prevail. However, it is fundamental and not to be forgotten that the zoning power is a police power of the state and the local authority is acting only as a delegate of that power and is restricted in the same manner as is the state. So, when regulation does have a substantial external impact, the welfare of the state's citizens beyond the borders of the particular municipality cannot be disregarded and must be recognized and served.
This essential was distinctly pointed out in Euclid, where Mr. Justice Sutherland specifically referred to "* * * the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way." (272 U.S. at 390, 47 S.Ct. at 119, 71 L.Ed. at 311). Chief Justice Vanderbilt said essentially the same thing, in a different factual context, in the early leading case of Duffcon Concrete Products, Inc. v. Borough of Cresskill, 1 N.J. 509 (1949), when he spoke of the necessity of regional considerations in zoning and added this:
* * * The effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or *178 of politics that are no longer significant with respect to zoning. The direction of growth of residential areas on the one hand and of industrial concentration on the other refuses to be governed by such artificial lines. Changes in methods of transportation as well as in living conditions have served only to accentuate the unreality in dealing with zoning problems on the basis of the territorial limits of a municipality. (1 N.J. at 513).
See, to the same general effect, Borough of Cresskill v. Borough of Dumont, 15 N.J. 238, 247-249 (1954).
In recent years this court has once again stressed this nonlocal approach to the meaning of "general welfare" in cases involving zoning as to facilities of broad public benefit as distinct from purely parochial interest. See Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough, 42 N.J. 556, 566 (1964), id., 47 N.J. 211 (1966). In this case we pointed out local action with respect to private educational projects largely benefitting those residing outside the borough must be exercised "with due concern for values which transcend municipal lines." (47 N.J. at 218). Likewise in Kunzler v. Hoffman, 48 N.J. 277 (1966), a case unsuccessfully attacking a use variance granted a private hospital to serve the emotionally disturbed in a wide area of the state, we rejected the contention that local zoning authorities are limited to a consideration of only those benefits to the general welfare which would be received by residents of the municipality, pointing out that "general welfare" in the context there involved "comprehends the benefits not merely within municipal boundaries but also those to the regions of the State relevant to the public interest to be served." 48 N.J. at 288.
This brings us to the relation of housing to the concept of general welfare just discussed and the result in terms of land use regulation which that relationship mandates. There cannot be the slightest doubt that shelter, along with food, are the most basic human needs. See Robinson v. Cahill, supra (62 N.J. at 483). "The question of whether a citizenry has adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body." New Jersey Mortgage Finance Agency v. *179 McCrane, 56 N.J. 414, 420 (1970). Cf. DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 442 (1970). The same thought is implicit in the legislative findings of an extreme, long-time need in this state for decent low and moderate income housing, set forth in the numerous statutes providing for various agencies and methods at both state and local levels designed to aid in alleviation of the need. See, e.g., Mortgage Finance Agency Law, N.J.S.A. 17:1B-5 (L. 1970, c. 38); Department of Community Affairs Demonstration Grant Law, N.J.S.A. 52:27D-61 (L. 1967, c. 82); Local Housing Authorities Law, N.J.S.A. 55:14A-2 (L. 1938, c. 19); Housing Co-operation Law, N.J.S.A. 55:14B-2 (L. 1938, c. 20); Redevelopment Companies Law, N.J.S.A. 55:14D-2 (L. 1944, c. 169); State Housing Law, N.J.S.A. 55:14H-2 (L. 1949, c. 303); Senior Citizens Nonprofit Rental Housing Tax Law, N.J.S.A. 55:14I-2 (L. 1965, c. 92); Housing Finance Agency Law, N.J.S.A. 55:14J-2 (L. 1967, c. 81); Limited-Dividend Nonprofit Housing Corporations or Associations Law, N.J.S.A. 55:16-2 (as amended L. 1967, c. 112).
It is plain beyond dispute that proper provision for adequate housing of all categories of people is certainly an absolute essential in promotion of the general welfare required in all local land use regulation. Further the universal and constant need for such housing is so important and of such broad public interest that the general welfare which developing municipalities like Mount Laurel must consider extends beyond their boundaries and cannot be parochially confined to the claimed good of the particular municipality. It has to follow that, broadly speaking, the presumptive obligation arises for each such municipality affirmatively to plan and provide, by its land use regulations, the reasonable opportunity for an appropriate variety and choice of housing, including, of course, low and moderate cost housing, to meet the needs, desires and resources of all categories of people who may desire to live within its boundaries. Negatively, it *180 may not adopt regulations or policies which thwart or preclude that opportunity.
It is also entirely clear, as we pointed out earlier, that most developing municipalities, including Mount Laurel, have not met their affirmative or negative obligations, primarily for local fiscal reasons. Governor Cahill summed it up in his 1970 special legislative message, A Blueprint for Housing in New Jersey, supra, at 10-11:
We have reached a point in the State where the zoning criteria in many municipalities is two-fold; dwelling units of all kinds must be curtailed; industrial development must be encouraged. This is a far cry from the original concept of municipal zoning and planning * * *. The fundamental objective of (the) constitutional amendment and the implementing Municipal Zoning Enabling Act was local control of zoning and planning for the purpose of effecting the public good * * *. The original concept of local planning and zoning never contemplated prohibition in lieu of regulation nor the welfare of the few in place of the general welfare.
The exclusionary details are fully set forth in Land Use Regulation, The Residential Land Supply, previously referred to.
In sum, we are satisfied beyond any doubt that, by reason of the basic importance of appropriate housing and the long-standing pressing need for it, especially in the low and moderate cost category, and of the exclusionary zoning practices of so many municipalities, conditions have changed, and consistent with the warning in Pierro, supra, judicial attitudes must be altered from that espoused in that and other cases cited earlier, to require, as we have just said, a broader view of the general welfare and the presumptive obligation on the part of developing municipalities at least to afford the opportunity by land use regulations for appropriate housing for all.
We have spoken of this obligation of such municipalities as "presumptive." The term has two aspects, procedural and substantive. Procedurally, we think the basic importance of appropriate housing for all dictates that, when it is shown that a developing municipality in its land use regulations has *181 not made realistically possible a variety and choice of housing, including adequate provision to afford the opportunity for low and moderate income housing or has expressly prescribed requirements or restrictions which preclude or substantially hinder it, a facial showing of violation of substantive due process or equal protection under the state constitution has been made out and the burden, and it is a heavy one, shifts to the municipality to establish a valid basis for its action or non-action. Robinson v. Cahill, supra, 62 N.J. at 491-492, and cases cited therein. The substantive aspect of "presumptive" relates to the specifics, on the one hand, of what municipal land use regulation provisions, or the absence thereof, will evidence invalidity and shift the burden of proof and, on the other hand, of what bases and considerations will carry the municipality's burden and sustain what it has done or failed to do. Both kinds of specifics may well vary between municipalities according to peculiar circumstances.
We turn to application of these principles in appraisal of Mount Laurel's zoning ordinance, useful as well, we think, as guidelines for future application in other municipalities.
The township's general zoning ordinance (including the cluster zone provision) permits, as we have said, only one type of housing  single-family detached dwellings. This means that all other types  multi-family including garden apartments and other kinds housing more than one family, town (row) houses, mobile home parks  are prohibited.[12] *182 Concededly, low and moderate income housing has been intentionally excluded. While a large percentage of the population living outside of cities prefers a one-family house on its own sizeable lot, a substantial proportion do not for various reasons. Moreover, single-family dwellings are the most expensive type of quarters and a great number of families cannot afford them.[13] Certainly they are not pecuniarily feasible for low and moderate income families, most young people and many elderly and retired persons, except for some of moderate income by the use of low cost construction on small lots.
As previously indicated, Mount Laurel has allowed some multi-family housing by agreement in planned unit developments, but only for the relatively affluent and of no benefit to low and moderate income families. And even here, the contractual agreements between municipality and developer sharply limit the number of apartments having more than one bedroom.[14] While the township's PUD ordinance has been repealed, we mention the subject of bedroom restriction because, assuming the overall validity of the PUD technique (see footnote (5), supra), the measure could be *183 reenacted and the subject is of importance generally. The design of such limitations is obviously to restrict the number of families in the municipality having school age children and thereby keep down local education costs.[15] Such restrictions are so clearly contrary to the general welfare as not to require further discussion. Cf. Molino v. Mayor and Council of Borough of Glassboro, 116 N.J. Super. 195 (Law Div. 1971).
Mount Laurel's zoning ordinance is also so restrictive in its minimum lot area, lot frontage and building size requirements, earlier detailed, as to preclude single-family housing for even moderate income families. Required lot area of at least 9,375 square feet in one remaining regular residential zone and 20,000 square feet (almost half an acre) in the other, with required frontage of 75 and 100 feet, respectively, cannot be called small lots and amounts to low density zoning, very definitely increasing the cost of purchasing and improving land and so affecting the cost of housing.[16] As to building size, the township's general requirements of a minimum dwelling floor area of 1,100 square feet for all one-story houses and 1,300 square feet for all of one and one-half stories or higher is without regard to required minimum lot size or frontage or the number of occupants (see Sente v. Mayor *184 and Municipal Council of City of Clifton, 66 N.J. 204, 208-209 (1974)). In most aspects these requirements are greater even than those approved in Lionshead Lake, Inc. v. Township of Wayne, supra, 10 N.J. 165, almost 24 years ago and before population decentralization, outer suburban development and exclusionary zoning had attained today's condition. See also Williams and Wacks, Segregation of Residential Areas Along Economic Lines: Lionshead Lake Revisited, 1969 Wis. L. Rev. 827.[17] Again it is evident these requirements increase the size and so the cost of housing. The conclusion is irresistible that Mount Laurel permits only such middle and upper income housing as it believes will have sufficient taxable value to come close to paying its own governmental way.
Akin to large lot, single-family zoning restricting the population is the zoning of very large amounts of land for industrial and related uses. Mount Laurel has set aside almost 30% of its area, over 4,100 acres, for that purpose; the only residential use allowed is for farm dwellings. In almost a decade only about 100 acres have been developed industrially. Despite the township's strategic location for motor transportation purposes, as intimated earlier, it seems plain that the likelihood of anywhere near the whole of the zoned area being used for the intended purpose in the foreseeable future is remote indeed and that an unreasonable amount of land has thereby been removed from possible residential development, again seemingly for local fiscal reasons.[18]
*185 Without further elaboration at this point, our opinion is that Mount Laurel's zoning ordinance is presumptively contrary to the general welfare and outside the intended scope of the zoning power in the particulars mentioned. A facial showing of invalidity is thus established, shifting to the municipality the burden of establishing valid superseding reasons for its action and non-action.[19] We now examine the reasons it advances.
The township's principal reason in support of its zoning plan and ordinance housing provisions, advanced especially strongly at oral argument, is the fiscal one previously adverted to, i.e., that by reason of New Jersey's tax structure which substantially finances municipal governmental and educational costs from taxes on local real property, every municipality may, by the exercise of the zoning power, allow only such uses and to such extent as will be beneficial to the local tax rate. In other words, the position is that any municipality may zone extensively to seek and encourage the "good" tax ratables of industry and commerce, and limit the permissible types of housing to those having the fewest school children or to those providing sufficient value to attain or approach paying their own way taxwise.
We have previously held that a developing municipality may properly zone for and seek industrial ratables to create a better economic balance for the community vis-a-vis educational and governmental costs engendered by residential development, provided that such was "* * * done reasonably as part of and in furtherance of a legitimate comprehensive plan for the zoning of the entire municipality." Gruber v. Mayor and Township Committee of Raritan Township, 39 N.J. 1, 9-11 (1962). We adhere *186 to that view today. But we were not there concerned with, and did not pass upon, the validity of municipal exclusion by zoning of types of housing and kinds of people for the same local financial end. We have no hesitancy in now saying, and do so emphatically, that, considering the basic importance of the opportunity for appropriate housing for all classes of our citizenry, no municipality may exclude or limit categories of housing for that reason or purpose. While we fully recognize the increasingly heavy burden of local taxes for municipal governmental and school costs on homeowners, relief from the consequences of this tax system will have to be furnished by other branches of government. It cannot legitimately be accomplished by restricting types of housing through the zoning process in developing municipalities.
The propriety of zoning ordinance limitations on housing for ecological or environmental reasons seems also to be suggested by Mount Laurel in support of the one-half acre minimum lot size in that very considerable portion of the township still available for residential development. It is said that the area is without sewer or water utilities and that the soil is such that this plot size is required for safe individual lot sewage disposal and water supply. The short answer is that, this being flat land and readily amenable to such utility installations, the township could require them as improvements by developers or install them under the special assessment or other appropriate statutory procedure. The present environmental situation of the area is, therefore, no sufficient excuse in itself for limiting housing therein to single-family dwellings on large lots. Cf. National Land and Investment Co. v. Kohn, 419 Pa. 504, 215 A.2d 597 (1965). This is not to say that land use regulations should not take due account of ecological or environmental factors or problems. Quite the contrary. Their importance, at last being recognized, should always be considered. Generally only a relatively small portion of a developing *187 municipality will be involved, for, to have a valid effect, the danger and impact must be substantial and very real (the construction of every building or the improvement of every plot has some environmental impact)  not simply a makeweight to support exclusionary housing measures or preclude growth  and the regulation adopted must be only that reasonably necessary for public protection of a vital interest. Otherwise difficult additional problems relating to a "taking" of a property owner's land may arise. See AMG Associates v. Township of Springfield, 65 N.J. 101, 112, n. (4) (1974).
By way of summary, what we have said comes down to this. As a developing municipality, Mount Laurel must, by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income. It must permit multi-family housing, without bedroom or similar restrictions, as well as small dwellings on very small lots, low cost housing of other types and, in general, high density zoning, without artificial and unjustifiable minimum requirements as to lot size, building size and the like, to meet the full panoply of these needs. Certainly when a municipality zones for industry and commerce for local tax benefit purposes, it without question must zone to permit adequate housing within the means of the employees involved in such uses. (If planned unit developments are authorized, one would assume that each must include a reasonable amount of low and moderate income housing in its residential "mix," unless opportunity for such housing has already been realistically provided for elsewhere in the municipality.) The amount of land removed from residential use by allocation to industrial and commercial purposes must be reasonably related to the present and future potential for such purposes. In other words, *188 such municipalities must zone primarily for the living welfare of people and not for the benefit of the local tax rate.[20]
We have earlier stated that a developing municipality's obligation to afford the opportunity for decent and adequate low and moderate income housing extends at least to "* * * the municipality's fair share of the present and prospective regional need therefor."[21] Some comment on *189 that conclusion is in order at this point. Frequently it might be sounder to have more of such housing, like some specialized land uses, in one municipality in a region than in another, because of greater availability of suitable land, location of employment, accessibility of public transportation or some other significant reason. But, under present New Jersey legislation, zoning must be on an individual municipal basis, rather than regionally.[22] So long as that situation persists under the present tax structure, or in the absence of some kind of binding agreement among all the municipalities of a region, we feel that every municipality therein must bear its fair share of the regional burden. (In this respect our holding is broader than that of the trial court, which was limited to Mount Laurel-related low and moderate income housing needs.)
The composition of the applicable "region" will necessarily vary from situation to situation and probably no hard and fast rule will serve to furnish the answer in every case. Confinement *190 to or within a certain county appears not to be realistic, but restriction within the boundaries of the state seems practical and advisable. (This is not to say that a developing municipality can ignore a demand for housing within its boundaries on the part of people who commute to work in another state.) Here we have already defined the region at present as "those portions of Camden, Burlington and Gloucester Counties within a semicircle having a radius of 20 miles or so from the heart of Camden City." The concept of "fair share" is coming into more general use and, through the expertise of the municipal planning adviser, the county planning boards and the state planning agency, a reasonable figure for Mount Laurel can be determined, which can then be translated to the allocation of sufficient land therefor on the zoning map. See generally, New Jersey Trends, ch. 27, Listokin, Fair Share Housing Distribution: An Idea Whose Time Has Come?, p. 353.[23] We may add that we think that, in arriving at such a determination, the type of information and estimates, which the trial judge (119 N.J. Super. at 178) directed the township to compile and furnish to him, concerning the housing needs of persons of low and moderate income now or formerly residing in the township in substandard dwellings and those presently employed or reasonably expected to be employed therein, will be pertinent.
There is no reason why developing municipalities like Mount Laurel, required by this opinion to afford the opportunity for all types of housing to meet the needs of various categories of people, may not become and remain attractive, viable communities providing good living and adequate services for all their residents in the kind of atmosphere which a democracy and free institutions demand. They can have industrial sections, commercial sections and sections for every kind of housing from low cost and multi-family to lots *191 of more than an acre with very expensive homes. Proper planning and governmental cooperation can prevent over-intensive and too sudden development, insure against future suburban sprawl and slums and assure the preservation of open space and local beauty. We do not intend that developing municipalities shall be overwhelmed by voracious land speculators and developers if they use the powers which they have intelligently and in the broad public interest. Under our holdings today, they can be better communities for all than they previously have been.

III

The Remedy
As outlined at the outset of this opinion, the trial court invalidated the zoning ordinance in toto and ordered the township to make certain studies and investigations and to present to the court a plan of affirmative public action designed "to enable and encourage the satisfaction of the indicated needs" for township related low and moderate income housing. Jurisdiction was retained for judicial consideration and approval of such a plan and for the entry of a final order requiring its implementation.
We are of the view that the trial court's judgment should be modified in certain respects. We see no reason why the entire zoning ordinance should be nullified. Therefore we declare it to be invalid only to the extent and in the particulars set forth in this opinion. The township is granted 90 days from the date hereof, or such additional time as the trial court may find it reasonable and necessary to allow, to adopt amendments to correct the deficiencies herein specified. It is the local function and responsibility, in the first instance at least, rather than the court's, to decide on the details of the same within the guidelines we have laid down. If plaintiffs desire to attack such amendments, they may do so by supplemental complaint filed in this cause within 30 days of the final adoption of the amendments.
*192 We are not at all sure what the trial judge had in mind as ultimate action with reference to the approval of a plan for affirmative public action concerning the satisfaction of indicated housing needs and the entry of a final order requiring implementation thereof. Courts do not build housing nor do municipalities. That function is performed by private builders, various kinds of associations, or, for public housing, by special agencies created for that purpose at various levels of government. The municipal function is initially to provide the opportunity through appropriate land use regulations and we have spelled out what Mount Laurel must do in that regard. It is not appropriate at this time, particularly in view of the advanced view of zoning law as applied to housing laid down by this opinion, to deal with the matter of the further extent of judicial power in the field or to exercise any such power. See, however, Pascack Association v. Mayor and Council of Township of Washington, 131 N.J. Super. 195 (Law Div. 1974), and cases therein cited, for a discussion of this question. The municipality should first have full opportunity to itself act without judicial supervision. We trust it will do so in the spirit we have suggested, both by appropriate zoning ordinance amendments and whatever additional action encouraging the fulfillment of its fair share of the regional need for low and moderate income housing may be indicated as necessary and advisable. (We have in mind that there is at least a moral obligation in a municipality to establish a local housing agency pursuant to state law to provide housing for its resident poor now living in dilapidated, unhealthy quarters.) The portion of the trial court's judgment ordering the preparation and submission of the aforesaid study, report and plan to it for further action is therefore vacated as at least premature. Should Mount Laurel not perform as we expect, further judicial action may be sought by supplemental pleading in this cause.
The judgment of the Law Division is modified as set forth herein. No costs.
*193 MOUNTAIN, J. (concurring).
I agree with the conclusions reached in the Court's opinion and essentially with the opinion itself. In one important respect, however, I disagree. The Court rests its decision upon a ground of State constitutional law. I reach the same result by concluding that the term, "general welfare," appearing in N.J.S.A. 40:55-32, can and should properly be interpreted with the same amplitude attributed to that phrase in the opinion of the Court, as well as otherwise in the manner there set forth. I therefore would rest the conclusions we here announce upon an interpretation of the statute, and not upon the State constitution.
Accordingly, since I read the statute  without resort to the Constitution  to justify, if not compel, our decision, I find it unnecessary to express any view as to the merits of the constitutional argument set forth in the Court's opinion.
PASHMAN, J. (concurring).
With this decision, the Court begins to cope with the dark side of municipal land use regulation  the use of the zoning power to advance the parochial interests of the municipality at the expense of the surrounding region and to establish and perpetuate social and economic segregation.
The problem is not a new one. Early opponents of zoning advanced the possibility of such abuse as an argument against allowing municipalities the power to zone. See, e.g., Ambler Realty Co. v. Euclid, 297 F. 307, 316 (N.D. Ohio 1924), rev'd 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Later, even those sympathetic to the goals and methods of zoning began to express concern. See, e.g., Haar, "Zoning for Minimum Standards: The Wayne Township Case," 66 Harv. L. Rev. 1051 (1953). In that spirit, Justice Jacobs wrote for this Court in Pierro v. Baxendale, 20 N.J. 17, 29 (1955):
We are aware of the extensive academic discussion following the decisions in the Lionshead and Bedminster cases, supra, and the suggestion that the very broad principles which they embody may intensify dangers of economic segregation which even the more traditional *194 modes of zoning entail. * * * In the light of existing population and land conditions within our State these powers may fairly be exercised without in anywise endangering the needs or reasonable expectations of any segments of our people. If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed.
The growth of the new suburbs, first as affluent residential communities and, more recently, as sites for commercial and industrial development, leaving persons with low or even moderate incomes housed inadequately in the cities and the older, inner suburbs, far from new sources of employment, magnified the importance of the problem, moving it from the realm of speculation to that of physical and social reality. Justice Hall was among the first to recognize the new significance of the problem in his now classic dissent to Vickers v. Gloucester Tp., 37 N.J. 232, 252 (1962), appeal dismissed 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963). The facts of this case, as well as the information compiled by various governmental agencies, of which the Court may take notice, e.g., Nat'l Comm'n on Urban Problems, Building the American City, H.R. Doc. No. 34, 91st Cong. 1st Sess. 211 (1968); N.J. Dept. of Community Affairs, Land Use Regulation: The Residential Land Supply (1972),[1] demonstrate that judicial action in this area is long overdue.
Therefore, I join in the thoughtful and eloquent majority opinion of Justice Hall. I differ from the majority only in that I would have the Court go farther and faster in its implementation of the principles announced today. The fact that abuses of the municipal zoning power are now widespread and derive from attitudes and premises deeply ingrained in the suburban planning and zoning processes requires that the Court not restrict itself to the facts of this particular case but, rather, lay down broad guidelines for judicial review of municipal zoning decisions which implicate *195 these abuses. Cf. Busik v. Levine, 63 N.J. 351, 363-64 (1973), appeal dismissed 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).

I
The misuse of the municipal zoning power at issue in this case, generically described as "exclusionary zoning," see, e.g., Brooks, Exclusionary Zoning 3 (Am. Soc'y of Planning Officials 1970), involves two distinct but interrelated practices: (1) the use of the zoning power by municipalities to take advantage of the benefits of regional development without having to bear the burdens of such development; and (2) the use of the zoning power by municipalities to maintain themselves as enclaves of affluence or of social homogeneity.
Both of these practices are improper and to be strongly condemned. They are violative of the requirement, found both in the Constitution of 1947, Art. I, § 1 and the zoning enabling statute itself, N.J.S.A. 40:55-32, that municipal zoning ordinances further the general welfare. Cf. Cresskill v. Dumont, 15 N.J. 238, 247-49 (1954); Duffcon Concrete Products, Inc. v. Cresskill, 1 N.J. 509 (1949). They are inconsistent with the fundamental premise of the New Jersey zoning legislation that zoning is concerned with the physical condition of the municipality not its social condition. In a deeper sense, they are repugnant to the ideals of the pluralistic democracy which America has become.
The motivation for exclusionary zoning practices are deeply embedded in the nature of suburban development. In part, these practices are motivated by fear of the fiscal consequences of opening the community to all social and economic classes. Residents of the municipality anticipate that higher density development will require the construction of additional roads, sewers, and water systems, the provision of additional municipal services, and the increase of school expenditures, all of which must be financed through local property taxes. Often, although not universally, this is a reasonable concern, *196 see generally Sternlieb, Residential Development, Urban Growth and Municipal Costs (1973); N.J. Cty. & Mun. Gov. Study Comm'n, Housing & Suburbs: Fiscal & Social Impact of Multifamily Development (1974), and, as long as these costs are primarily financed through local property taxes, will continue to impel suburban communities to use the zoning laws to encourage commercial development and discourage settlement of less affluent families. But cf. Robinson v. Cahill, 62 N.J. 473 (1973), cert. denied 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). Insofar as this fiscal situation prevails, suburban communities will find the temptation of exclusionary zoning alluring.
In addition, exclusionary zoning practices are also often motivated by fear of and prejudices against other social, economic, and racial groups.[2]Nat'l Comm. Against Discrimination in Housing, Jobs and Housing: Final Summary Report on the Housing Component, 25-29 (1972). Thus, in a recent survey of suburban municipal leaders, 42.6% identified social and racial conflict as being the chief impact of low and moderate cost subsidized housing on the municipality, while only 21.3% identified fiscal problems as the chief impact. Cty. & Mun. Gov. Study Comm'n, Housing & Suburbs: Fiscal & Social Impact of Multifamily Development, supra at 86. A large proportion felt that even State assumption of the additional municipal costs of a balanced housing policy would not make a great impact on the general unacceptability of low or moderate income housing. Id. at 89. Nor are these attitudes, however disappointing we may find them at this late date, wholly surprising. Many people who settle in suburban areas do so with the specific intention of living in affluent, socially homogeneous communities and of escaping what they perceive to be the problems of the cities. See generally, Clawson, Suburban Land Conversion in the *197 United States, 45 (1971). They do not wish their insular communities to be disturbed by the introduction of diverse social, racial, and economic groups. The experience of the nation over the past 20 years must serve as a caution that, however much we might wish it, we cannot expect rapid, voluntary reversal of such attitudes.
Exclusionary zoning may assume a wide variety of forms. Ultimately, the existence of such practices must be measured by exclusionary intent and actual or potential exclusionary effect. Cf. Hawkins v. Shaw, 437 F.2d 1286 (5 Cir.1971); Hobson v. Hansen, 269 F. Supp. 401 (D.D.C. 1967), aff'd sub nom. Smuck v. Hobson, 132 U.S. App. D.C. 372, 408 F.2d 175 (D.C. Cir.1969). Some zoning devices, however, which are inherently exclusionary in effect or which lend themselves especially readily to abuse have come into wide-spread use and are a revealing gauge of the extent of exclusionary zoning in New Jersey:

1) Minimum house size requirements

As of 1970, 92% of the land in the Department of Community Affairs study area[3] zoned for single family housing was covered by some minimum house size requirement. More than 65% was zoned for houses with 1,000 square feet or more of floor space, and 38.9% for houses of 1,200 square feet or more. By contract, the controversial case of Lionshead *198 Lake v. Wayne Tp., 10 N.J. 165 (1953), appeal dismissed 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953), upheld a minimum of 768 square feet in all districts. There is wide variation from county to county and within the various counties.[4] In the so-called "outer-ring" counties in northern New Jersey  Morris, Somerset, Middlesex, and Monmouth[5]  houses of less than 1,000 square feet may be built on only about 10% of the land zoned for single family dwellings. On 77% of the land zoned for single family dwellings, houses must have 1,200 square feet or more of floor space. In the South Jersey outer-ring counties, Burlington, Camden, and Gloucester, the figures are 31.9% and 43.5% respectively.
The effect on the cost of housing of such requirements is obvious. If one assumes construction costs of $20 per square foot of floor space,[6] a 1,000 square foot minimum imposes a corresponding minimum figure of $20,000 upon the portion of the cost of a new house attributable to construction. A recent *199 study of housing costs indicates that floor space is the single most important factor contributing to differences in prices for new housing, even more important than the socio-economic status of the municipality. Sagalyn & Sternlieb, supra at 48.

2) Minimum lot size and minimum frontage requirements

On two-thirds of the land in the Department of Community Affairs study area zoned in 1970 for single family dwellings, houses could not be built on lots of less than an acre. Upon only 5.1% could houses be built on 10,000 square feet or less. Approximately 10% of such land in the outer-ring counties in South Jersey was zoned for 10,000 square foot lots or less; 45.9% was zoned for an acre or more. In the North Jersey outer-ring counties only 1.2% of the land zoned for single family dwellings was available for use as lots of 10,000 square feet or less; 77% was zoned for one acre or larger lots. Here, too, there are wide variations among counties. In Camden, 24.5% of the land was zoned for lots of 10,000 square feet or less, and less than 34% for lots of an acre or more. In Somerset County, only .2% of the land was zoned for lots of 10,000 square feet or less; 85.3% was zoned for lots of an acre or more, and 24.6% was zoned for three acres or more. By way of comparison, the American Public Health Association, a vigorous advocate of high minimum standards, recommends 6,000 square feet as a suitable minimum lot size based upon health considerations. Am. Public Health Ass'n, Planning the Neighborhood, 37 (1948).
Minimum frontage requirements frequently, although not invariably, are found together with minimum lot size requirements. The Residential Land Supply at 21-24. Only 13.5% of the land zoned in 1970 for single family housing in the Department of Community Affairs study area was zoned for 100 foot minimum frontage or less. In that area, 54.3% was zoned for 150 feet or more. This device was widely used in the northern outer-ring counties, where only 5% of the land is zoned for less than 100 foot frontage and 68.4% is zoned for more than 150 feet, but somewhat less widely used in the southern outer-ring counties, where 22.7% of *200 the land was zoned for less than 100 foot frontage and 42.5% was zoned for more than 150 feet.
Analysis of the exclusionary impact of the widespread use of minimum lot size and minimum frontage requirements is a more complex task than that of analyzing minimum building requirements. See generally, Building the American City, supra at 213-15; Williams & Norman, supra at 493-97; Sagalyn & Sternlieb, supra at 6-16, 66-67. There is a significant correlation between lot size and price of housing in areas without sewage service and between frontage and price in areas with sewage service. Sagalyn & Sternlieb, supra at 54-56. At the very least, it can be said with certainty that extensive mapping for large lots or large lot widths drives up the cost of smaller lots and thereby significantly raises the overall price of housing. Williams & Norman, supra at 496-97.

3) Prohibition of multifamily housing

Realistically, much of the housing needs of persons with low or moderate incomes will have to be met through various forms of multifamily housing. Williams & Norman, supra at 481. Hence, restrictions upon the construction of such housing have a highly exclusionary effect. In the Department of Community Affairs study area, construction of multi-family housing was permitted on only 6.2% of the land zoned for residential uses. If six aberrant rural municipalities are disregarded, the percentage falls to 1.1%.[7] In the South Jersey outer-ring counties, 2.7% of such land is zoned for multifamily housing; in the northern outer-ring counties, only 1/2 of 1% is so zoned. There is no land zoned for multi-family *201 housing in Somerset County and only .006% is so zoned in Monmouth County.[8]

4) Bedroom restrictions

The effect of zoning against multifamily dwellings is magnified by restrictions upon the number of bedrooms which may be included in each dwelling unit. In the Department of Community Affairs study area[9] 59% of the already limited area of land zoned for multifamily dwellings is restricted to one-bedroom or efficiency apartments. On only 20.4% of this land is construction of apartments of three or more bedrooms permitted. In addition, in many areas where some construction of larger apartments is permitted, they are limited to a small percentage of any individual development. The Residential Land Supply, supra at 11. In the North Jersey outer-ring counties, 78% of the land zoned for multi-family housing is burdened with bedroom restrictions. In the South Jersey outer-ring counties, 83% of the land zoned for multifamily housing is so restricted. The situation is particularly acute in Burlington County, where 95.8% of the land zoned for multifamily housing has bedroom restrictions.
The Department of Community Affairs concluded from these figures that: *202 * * * [I]n general, the multi-family zoned land is geared to accommodate the housing needs of single people, married couples without children, and retired people, and not geared to the housing needs of the large part of the population living as families with children. [The Residential Land Supply, supra at 12; footnote omitted].

5) Prohibition of mobile homes

Mobile homes offer an alternate, less expensive form of housing. They have long since ceased to be mere "house trailers" but have become an important form of mass produced semi-permanent housing. Indeed, for many persons they may be the only form of new housing available. However, only .1% of the land zoned for residential use in the Department of Community Affairs study area was zoned for use by mobile homes. In the South Jersey outer-ring counties, .3% of the residential land was so zoned, the bulk of it being in Gloucester County, which had twice as much land zoned for mobile homes as the rest of the study area combined. None was zoned for this purpose in Camden County. No land was zoned for mobile homes in the northern outer-ring counties.[10]

6) Overzoning for nonresidential uses

Zoning a great proportion of the developable land in a municipality noncumulatively for nonresidential uses may have the effect of forcing the price of land zoned for residential purposes up beyond the reach of persons with low or moderate incomes. Neither statewide nor countywide figures provide unambiguous evidence of the use of such practice at present in New Jersey. Land Use Regulation, supra at 6-8; Sagalyn & Sternlieb, supra at 96. At the municipal level, the use of such practices is more evident in some areas. Thus, in Mt. Laurel itself, 29.2% of the land in the township, totaling 4,121 acres, is zoned for industrial uses, although *203 only 100 acres within the township has actually been developed for such use in the past 10 years, and there is no reasonable prospect of industrial uses expanding to such proportions.
If anything, these figures underestimate the extent of exclusionary zoning in this State. A wide variety of other techniques may be used to achieve an exclusionary effect. In addition, a municipality need not use all of these techniques to achieve exclusionary ends. Municipalities which have large lot-size and frontage requirements may not have building-size requirements and vice versa. Thus, only 18% of the land in the Department of Community Affairs study area zoned for single family residences permitted houses with less than 1,200 square feet of floor space to be constructed on a 1/4 acre or less site with 100 foot or less frontage.
Forceful judicial intervention is necessitated not only by the already widespread use of exclusionary zoning practices and by the fact that the motivations for such are deeply ingrained in the suburban zoning and planning process, but also by certain extrinsic factors of which the Court may take notice.
First, the United States suffers from an acute national housing shortage. It has been estimated that over 10 million dwelling units would be needed to provide each family in the country with adequate housing. Building the American City, supra at 75. In New Jersey, it has been estimated that there is an immediate need for over 400,000 dwelling units. Dep't of Community Affairs, The Housing Crisis in New Jersey, 1970 (1970).[11] New Jersey, already the second most densely populated state in the country, is experiencing continuing population growth  it is estimated that by 1985 the total population will have increased from its 1970 figure of 7,200,000 to about 10,000,000. Special Message to the Legislature by Governor Cahill, A Blueprint for Housing in New *204 Jersey, Dec. 7, 1970, at 1. Housing, particularly in urban areas, is deteriorating. The percentage of substandard units throughout the State increased from 14.8% in 1960 to 17.4% in 1969. In Hudson County, the increase was from 22.3% to 31.3%. Housing Crisis in New Jersey, supra at 14. Some of these units dropped out of the housing market altogether. It has been estimated that simply to keep up with population growth and to replace units which drop out of the housing market, 100,000 new units would have to be constructed in the State each year. Special Message to the Legislature by Governor Cahill, A Blueprint for Housing in New Jersey, Dec. 7, 1970, at 1. In fact, the construction of new housing in the State peaked in 1964, when permits were issued for the construction of 68,078 units, and has declined steadily since then. In 1970, permits were issued for construction of only 39,897 units. Sagalyn & Sternlieb, Zoning & Housing Costs, 98 (1972).
The brunt of this shortage is, of course, borne by persons with low or moderate incomes. As of 1970, it was estimated that not only were half of all low income families in the State obliged to live in inadequate housing, but so were approximately 125,000 families with moderate incomes. Housing Crisis in New Jersey, supra at iv. The median cost of a new single family detached house was $30,000 in the northeastern region of the country in 1969. Sagalyn & Sternlieb, supra at 20. Prices since then have risen precipitously. A study made in 1971 found median new house costs in suburban counties to range from $33,263 in Burlington to $62,500 in Somerset and $67,000 in Bergen. Id. at 22. Such housing was effectively beyond the reach of families with incomes of less than $15,000 per year. Housing Crisis in New Jersey, supra at 42. As of the time of that study, the median family income in New Jersey was $11,407 per year. Analyses by both the federal and state governments, Building the American City, supra at 93; Housing Crisis in New Jersey, supra at 40-43, indicate that the majority of families can afford to neither rent nor buy new housing at current prices. Other *205 authorities estimate that such housing may be beyond the financial capacity of as much as 3/4 of all the families in the State, Sagalyn & Sternlieb, supra at 64, and as much as 90% of those families in which the head of the household is below the age of 35. Nat'l Comm. Against Discrimination in Housing, Housing and Jobs: Final Summary Report on the Housing Component, supra at 22. In theory, low and moderate income families should benefit even from construction of new housing which they themselves cannot afford because such housing creates vacancies which "filter down." In reality, however, most of these vacancies are absorbed by the enormous lag between population growth and new housing construction. Sagalyn & Sternlieb, supra at 42. The housing which does "filter down" to persons with low or moderate incomes is often badly dilapidated and in deteriorating neighborhoods. Building the American City, supra at 11; Clawson, Suburban Land Conversion in the United States, 330 (1970).
The existence of this housing shortage has been amply recognized by all branches of government in this State. See, e.g., Inganamort v. Borough of Fort Lee, 62 N.J. 521 (1973); N.J. Mortgage Finance Agency v. McCrane, 56 N.J. 414 (1970); Marini v. Ireland, 56 N.J. 130 (1970); Mortgage Finance Agency Law, N.J.S.A. 17:1B-5 (L. 1970, c. 38); Department of Community Affairs Demonstration Grant Law, N.J.S.A. 52:27D-61 (L. 1967, c. 82); Special Message to the Legislature by Governor Cahill, A Blueprint for Housing in New Jersey, Dec. 7, 1970; Special Message to the Legislature by Governor Cahill, New Horizons in Housing, Mar. 27, 1972.
Second, the growing movement of commerce and industry to the suburbs is imposing a heavy burden upon employees who are unable to obtain housing in these suburban areas. The trend, which began after World War II and has continued unabated, arises from a variety of causes  need for additional land for expansion, automated methods of handling goods which make single-floor layout of manufacturing plants economically desirable, increased access provided *206 by superhighways, desire for aesthetic surroundings, lower suburban property taxes, etc. See generally, Clawson, Suburban Land Conversion in the United States, 40 (1971). Retail establishments have also relocated in the suburbs, taking advantage of the shift in the affluent population, the access provided by suburban highways, and the more attractive surroundings. Id. at 40-41. The result has been a shift of blue-collar jobs from the cities to the suburbs. Id. at 40. Thus in the New York metropolitan region,[12] 75% of the 990,000 new jobs created between 1959 and 1967 were located outside of New York City. Jobs at manufacturing production sites outside New York City increased during that period by 138,440, while such jobs within New York City diminished by 47,110. Of the 100,600 new jobs created in retailing between 1959 and 1965, 95% were located outside of New York City. The new jobs created within New York City in recent years have been confined almost exclusively to services, finance, insurance, communications, utilities, government and manufacturing headquarters offices, all of which are fields with high percentages of white-collar employment. It appears that these trends will continue into the foreseeable future. It has been estimated that between 1970 and 1985 New York City will lose another 137,700 factory jobs, and the suburbs gain 122,700. Nat'l Comm. Against Discrimination in Housing, Jobs and Housing, 6-9 (1970). Job movement in the Philadelphia metropolitan region displays an essentially identical pattern. Nat'l Comm. Against Discrimination in Housing, Impact of Housing Patterns on Job Opportunities, 21-26 (1968). This is, of course, the natural and foreseeable consequence of "fiscal zoning" that encourages the development within a municipality of commercial establishments, which are net tax-providers, and discourages the development of housing for persons *207 who would work in such establishments, on the grounds that they are net revenue-absorbers.
This trend is one that imposes unfair burdens on the worker who is locked out of suburban residential areas. For blue-collar workers, commutation from the cities to suburban job locations is both time-consuming and prohibitively expensive. There is often no access at all by public mass transit and even when such transportation is available in theory it is frequently impractical in fact. Nat'l Comm. Against Discrimination in Housing, The Impact of Housing Patterns on Job Opportunities, supra at 27-30; Nat'l Comm. Against Discrimination in Housing, Jobs and Housing, supra at 23-26. See generally, Babcock and Bosselman, Exclusionary Zoning: Land Use Regulation in the 1970s, 114-15 (1973).
Third, even as we write, development proceeds apace. Once an area is developed, it becomes much more difficult to alter its social and economic character. There is a hazard that prolonged judicial inaction will permit exclusionary practices to continue to operate and will allow presently developing communities to acquire permanent exclusionary characteristics. The concern is not that New Jersey will soon be without developable land, but that large areas now in the process of development will have already acquired irrevocably exclusionary characteristics before the courts effectively intervene. Thus, the Delaware Valley Regional Planning Commission has estimated that the amount of developed land in the Philadelphia metropolitan area (including Burlington, Camden, Gloucester, and Mercer Counties) will increase by 38% between 1960 and 1985, Clawson, supra at 294, and the Regional Plan Association has estimated that intensive land use in the New York metropolitan area (which includes most of northern New Jersey) will double in the same period, Clawson, supra at 279.
Finally, we must take notice of the fact that the cost of building new housing has increased steadily over the past 10 years and shows all signs of continuing to increase in *208 the future. Between 1963 and 1969, the median sales price of new single-family housing in the northeastern part of the United States rose from $20,000 to $30,500. Sagalyn & Sternlieb, supra at 20. The costs of building rental housing had increased comparably. See generally, Clawson, supra at 82-83. As the costs of housing slip farther beyond the reach of persons of low and moderate incomes, the practical value of zoning reform diminishes and becomes increasingly contingent on the establishment of new State and federal housing subsidy programs.
Today's decision by its terms expressly concerns exclusionary zoning practices in municipalities which are developing but which "still are not completely developed and remain in the path of inevitable future residential, commercial and industrial demand and growth." Ante at 160. As to these communities, the Court holds:
* * * [E]very such municipality must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing. More specifically, presumptively it cannot foreclose the opportunity of the classes of people mentioned for low and moderate income housing and in its regulations must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional need therefor. These obligations must be met unless the particular municipality can sustain the heavy burden of demonstrating peculiar circumstances which dictate that it should not be required so to do. [Ante at 174; footnote omitted].
The majority has chosen not to explore in this case either the extent of the affirmative obligations upon developing municipalities or the role of the courts in enforcing those obligations. It has also chosen not to consider the degree to which the principles applicable to developing municipalities are also applicable to rural ones and to largely developed ones. The facts set out above seem to me to demonstrate that exclusionary zoning is a problem of such magnitude and depth as to require that the Court extend these principles to all municipalities in the State, recognizing, of *209 course, that they may have different implications for municipal conduct when applied in different areas, and that the Court establish a policy of active judicial enforcement, not only of the negative obligations imposed upon municipalities by this decision but also of the affirmative obligations.

II
I consider first the extent of the affirmative obligation to plan and provide for housing opportunities for persons with low and moderate incomes that municipalities assume when they choose to avail themselves of land use controls permitted by statute. Although this discussion will concern itself initially with developing municipalities, many of the same considerations also apply mutatis mutandi to developed municipalities and rural areas, as will subsequently become clear.
A municipality need not exercise at all the powers permitted it by the zoning and planning statutes, N.J.S.A. 40:55-30 et seq. and N.J.S.A. 40:55-1.1 et seq.[13] Once, however, it chooses to enter the field of land use regulation it assumes a duty  one of constitutional dimensions, deriving from N.J. Const. (1947), Art. I, § 1  to act affirmatively to provide its fair share of the low and moderate income housing necessary to meet the regional housing needs. Cf. Southern Alameda Spanish Speaking Organization v. Union City, 424 F.2d 291, 295-6 (9 Cir.1970); Williams, American Planning Law: Land Use and the Police Power §§ 66.15, 66.16 (1974).
The substantive content of this affirmative obligation will necessarily vary from municipality to municipality, depending *210 upon, among other things, the intensity of the regional housing needs, the extent of previous exclusionary practices by the municipality, and the degree to which the municipality is benefiting, directly or indirectly, from regional economic development. A factor of special importance is the sufficiency of local housing opportunities for persons who might fill jobs created by new commercial and industrial development in the locality. Cf. Building the American City, supra at 243; ALI, Model Land Development Code, § 7-405 (Ten. Draft No. 3, 1971); Babcock & Bosselman, Exclusionary Zoning: Land Use Regulation and Housing in the 1970s, 114-15 (1973).
Every developing municipality has at least a duty to consider regional housing needs in all its planning activities, both formal and informal, including its formulation of the comprehensive plan underlying its zoning ordinance, N.J.S.A. 40:55-21, its adoption of a master plan, N.J.S.A. 40:55-1.10 and its consideration of applications for zoning variances, N.J.S.A. 40:55-39, and for approval of subdivision plats, N.J.S.A. 40:55-1.14.[14] In addition, since effective planning for regional needs is virtually impossible without some degree of intergovernmental cooperation, all developing municipalities also have an affirmative obligation to cooperate, where appropriate, in regional planning efforts, to cooperate, for example, with regional planning boards established pursuant to N.J.S.A. 40:27-9 and in area review procedures established under the Intergovernmental Co-operation Act, 42 U.S.C. 4231 and implemented by U.S. Office of Management and Budget Circular A-95 (July 24, 1969) and N.J.A.C. 5:42-1.1 et seq. See generally Babcock & Bosselman, Exclusionary Zoning: Land Use Regulation and Housing in the 1970s, 135-47 (1973).
*211 There is little hope that the private housing construction industry will be able to satisfy the State's housing needs in the foreseeable future, even if all exclusionary barriers are removed. Building the American City, supra at 93. To meet these needs, State or federal assistance will be required. This fact has been recognized by both the State Legislature and Congress in a lengthy series of statutes providing governmental subsidies for private construction and ownership of low and moderate income housing. See, e.g., Housing and Community Development Act of 1974, 88 Stat. 633 (codified at various places in 12, 42 U.S.C.); National Housing Act of 1959, § 202, as amended, 12 U.S.C. 1701q; National Housing Act, §§ 235, 236, as amended, 12 U.S.C. 1715z, 1715z-1 et seq.; Mortgage Finance Agency Law, N.J.S.A. 17:1B-4 et seq.; Housing Finance Agency Law, N.J.S.A. 55:14J-1 et seq.; Department of Community Affairs Demonstration Grant Act, N.J.S.A. 52:27D-59 et seq. To a greater or lesser degree, all of the programs require active municipal cooperation. Failure to actively cooperate in the implementation of such programs as effectively thwarts the meeting of regional needs for low and moderate income housing as does outright exclusion. See, e.g., Farmworkers of Florida Housing Projects, Inc. v. Delray Beach, 493 F.2d 799 (5 Cir.1974); Kennedy Park Homes Ass'n v. Lackawanna, 318 F. Supp. 669 (W.D.N.Y. 1970), aff'd 436 F.2d 108 (2 Cir.1970), cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). Developing municipalities have a duty to make all reasonable efforts to encourage and facilitate private efforts to take advantage of these programs.
Finally, there may be circumstances in which the municipality has an affirmative duty to provide housing for persons with low and moderate incomes through public construction, ownership, or management. See, e.g., Community Development and Housing Act of 1974, Title II, 42 U.S.C. 1401 et seq.; Local Housing Authority Law, N.J.S.A. *212 55:14A-1; cf. Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F. Supp. 1257 (N.D. Ohio 1973) rev'd 500 F. 2d 1087 (6 Cir.1974), cert. den. 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975).
There are certain important limitations on the scope of these affirmative obligations. While municipalities must plan and provide for regional housing needs, no municipality need assume responsibility for more than its fair share of these needs. The purpose of land use regulation is to create pleasant, well-balanced communities, not to recreate slums in new locations. It is beyond dispute that when the racial and socioeconomic composition of the population of a community shifts beyond a certain point, the white and affluent begin to abandon the community. While the attitudes underlying this "tipping" effect must not be catered to, the phenomenon must be recognized as a reality. See, e.g., Graves v. Romney, 502 F.2d 1062 (8 Cir.1974), cert den. ___ U.S. ___, 95 S.Ct. 1354, 43 L.Ed.2d 440 (1975); Otero v. New York City Housing Authority, 484 F. 2d 1122 (2 Cir.1973). Municipalities have a legitimate interest in placing an upper limit on the extent of uses which, if permitted to expand without limit, might reasonably be feared to operate to the general detriment. Tidewater Oil Co. v. Carteret, 84 N.J. Super. 525 (App. Div. 1965), aff'd 44 N.J. 338 (1965). The limitation of the municipality's affirmative duty to one of providing for its fair share of reasonable needs responds to this interest. Cf. Mass. Gen. Laws Ann., c. 40B, §§ 20-23 (a statute authorizing the state to override local zoning restrictions for low and moderate income housing projects, but limiting the municipality's obligations to fixed annual and total maxima). A number of regions have, in response to the problem of exclusionary zoning, voluntarily sought to put such fair share housing plans into effect. See Babcock & Bosselman, supra at 109-13.
Nor need a municipality altogether give up control of the pace and sequence of development. A municipality has *213 a legitimate interest in insuring that residential development proceeds in an orderly and planned fashion, that the burdens upon municipal services do not increase faster than the practical ability of the municipality to expand the capacity of those services, and that exceptional environmental and historical features are not simply concreted over. See, e.g., Golden v. Ramapo Planning Board, 30 N.Y.2d 359, 334 N.Y.S. 2d 138, 285 N.E.2d 291 (1972), appeal dismissed 409 U.S. 1003, 93 S.Ct. 436, 34 L.Ed.2d 294 (1972); Construction Industry Ass'n of Sonoma County v. Petaluma, 375 F. Supp. 574 (N.D. Cal. 1974); Mass. Gen. Laws Ann., c. 40B, §§ 20, 23.[15] On the other hand, such regulations must be reasonable, substantially related to the purpose which they seek to achieve, and must adopt the least exclusionary means practical. "Zoning is a means by which a governmental body can plan for the future  it may not be used as a means to deny the future." National Land and Investment Co. v. Kohn, 419 Pa. 504, 528, 215 A.2d 597, 610 (Pa. Sup. Ct. 1965). By way of illustration, large lot zoning is commonly rationalized as a device for preventing premature development. Such zoning, it is claimed, merely creates holding zones. In practice, however, it appears that land zoned for large lots, even where intended as an interim holding zone, tends to become frozen in a pattern of low density development. Williams & Norman, supra at 495. Such zoning is not a reasonable device for regulating the pace and sequence of development. Its effects on development, if any, are merely exclusionary.
Finally, the affirmative duty to plan and provide for regional needs does not require the municipality to make any specific piece of property available for low or moderate income housing, absent a showing that there are inadequate alternative sites realistically available for that type of development. *214 A municipality must zone in accordance with a comprehensive plan. N.J.S.A. 40:55-32. Once it has adopted a comprehensive plan which properly provides for the community's fair share of the regional housing needs, it is entitled to be able to enforce that plan through its zoning ordinances. To permit a developer to come in at a later date and demand, as a matter of right, that a piece of property not presently zoned to permit development of low or moderate cost housing be so zoned, is to undermine the entire premise of land use regulations. Williams, supra at § 66.15; see Confederation de la Raza Unida v. Morgan Hill, 324 F. Supp. 895 (N.D. Cal. 1971). The one exception to this principle is the situation in which the developer can show that, as a matter of practical fact, sufficient land is not available for development in the areas zoned for low or moderate income housing. See, e.g., Kennedy Park Homes Association v. Lackawanna, 318 F. Supp. 669 (W.D.N.Y. 1970), aff'd 436 F. 2d 108 (2 Cir.1970), cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (construction of multi-family housing in area zoned for it would perpetuate a segregated housing pattern and add to existing problem of overcrowding); Pascack Ass'n v. Washington Tp., 131 N.J. Super. 195 (Law Div. 1974) (area zoned for multi-family housing was already largely occupied by other, non-residential uses, and was burdened with other zoning requirements that made construction of low or moderate income housing impractical).
The affirmative obligations of developing municipalities so far discussed are legally binding and judicially enforceable. It is a truism that courts have no inherent expertise in matters of land use planning. They are not equipped to sit as higher planning boards and substitute their judgment for municipal bodies lawfully established for the purpose of making planning and zoning decisions. Bow & Arrow Manor v. West Orange, 63 N.J. 335, 343 (1973); Kozesnik v. Montgomery Tp., 24 N.J. 154, 167 (1957). The decision as to *215 how the municipality should go about performing the affirmative duties set out above is one initially to be made by the officials of the municipality itself. Nevertheless, if the municipality has failed to take affirmative steps to make realistically possible a variety and choice of housing so as to meet its fair share of the regional housing needs, its actions are presumptively illegal and the burden shifts to the municipality to justify them. The mere fact that local land use control issues are involved does not preclude the court from making such determinations, nor, if a court finds that the municipality has failed to meet its obligation, from exercising the full panoply of equitable powers to remedy the situation. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2 Cir.1968); Hawkins v. Shaw, 437 F.2d 1286 (5 Cir.1971); Pascack Ass'n v. Washington Tp., 131 N.J. Super. 195 (Law Div. 1974).
Judicial enforcement of municipal obligations, both negative and affirmative, to plan and provide for a fair share of regional housing needs, even if only directed to one municipality, necessarily has grave implications for the entire region. In dealing with such cases courts must act both deliberately and imaginatively. In administering such relief the trial court ought to proceed in four steps:
(1) identify the relevant region;[16]
(2) determine the present and future housing needs of the region;
(3) allocate these needs among the various municipalities in the region;[17] and
*216 (4) shape a suitable remedial order.
Cf. Williams, American Planning Law: Land Use and the Police Power § 66.38 (1974). Needless to say, all of these steps involve difficult factual determinations based upon expert testimony and statistical evidence. It may well be appropriate for the court to appoint independent experts or consultants for its assistance, see Pascack Ass'n v. Washington Tp., 131 N.J. Super. 195 (Law Div. 1974); cf. Handleman v. Marwen Stores Corp., 53 N.J. 404 (1969); Polulich v. J.G. Schmidt Tool Die & Stamping Co., 46 N.J. Super. 135 (Cty. Ct. 1957); Manual for Complex Litigation, Pt. 1 §§ 1.42, 1.46, 2.60, 3.40 (1973), or to invite participation by the Department of Community Affairs as amicus curiae.
Since conflicting decisions within a given region would be highly undesirable, all municipalities in the region should be joined as parties at the earliest practical point in the proceedings, if not at the instance of one of the parties, then on the motion of the court. R. 4:28-1, 4:30.
*217 The trial court must be flexible and imaginative in molding remedies to fit the facts of each case, balancing the need to vindicate the rights of persons who have been or will be deprived of the opportunity for decent housing if no relief is granted against the principle of local decision-making in land use planning matters. Pascack Ass'n v. Washington Tp., supra; see e.g., Kennedy Park Homes Ass'n v. Lackawanna, 318 F. Supp. 669 (W.D.N.Y. 1970) aff'd 436 F.2d 108 (2 Cir.1970) cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F. Supp. 1257 (N.D. Ohio 1973) rev'd on other grounds, 500 F.2d 1087 (6 Cir.1974), cert. denied 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975); United Farmworkers of Florida Housing Projects, Inc. v. Delray Beach, 493 F.2d 799 (5 Cir.1974); Lakewood Homes, Inc. v. Lima Bd. of Adjustment, 23 Ohio Misc. 211, 52 Ohio Op.2d 213, 258 N.E.2d 470 (Ohio Ct. C.P. 1970); mod. 25 Ohio App.2d 125, 267 N.E.2d 595 (Ohio Ct. App. 1971).

III
It can hardly be denied that there are some suburban municipalities which have already developed in an exclusionary mold. These communities, which have benefited from regional development, have, by their land use controls, contributed to the regional housing shortages. Cf. United States v. Black Jack, 372 F. Supp. 319 (E.D. Mo. 1974). It would be both highly inequitable to absolve them of any responsibility for solving those problems and inconsistent with the legal analysis developed by the Court today. Although the majority does not reach this issue in the present case, I would hold that developed suburban municipalities which have availed themselves of the land use controls permitted by statute and which have not provided sufficient opportunities for development of low and moderate income housing to meet their fair share of regional needs, have both *218 a negative obligation not to use zoning and subdivision controls to obstruct the construction of such housing and an affirmative duty to plan and provide for such housing, insofar as these obligations can be carried out without grossly disturbing existing neighborhoods. It is, of course, neither practical nor wise to demand that such communities completely rezone established neighborhoods; to do so would in all likelihood contribute to neighborhood instability and permit certain property owners and developers to obtain windfalls rather than actually effecting construction of low or moderate income housing.
Occasions, however, arise in every community when land becomes available for development or redevelopment. It is on these occasions that these obligations come into play most strongly. Thus the existence of an unmet regional need for low and moderate income housing in appropriate cases must be given great weight in considering applications for variances under N.J.S.A. 40:55-39(d) to permit the construction of such housing. De Simone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428 (1970); Brunetti v. Madison Tp., 130 N.J. Super. 164 (Law Div. 1974).
The discussion above of judicial enforcement applies equally to developed suburban communities, save only that in formulating relief the trial judge must be alert to take into consideration the delicacy and difficulty of altering the character of already developed areas.

IV
Substantial portions of New Jersey are neither experiencing a surge of development nor situated in the imminently foreseeable path of development. These include much of Cape May, Cumberland, and Salem Counties, portions of Atlantic, Ocean, Sussex and Warren Counties, and some rural areas in other parts of the State. In these municipalities, it is not meaningful to speak of failure to meet regional housing needs, not because there are no persons who are inadequately *219 housed,[18] but because it is not yet meaningful to speak of "regional" needs nor is it clear that land use controls play a significant role in the housing shortage at the present time. Nevertheless, the time may well come when the frontiers of suburbia will reach these areas. Municipalities may not act to deter the future development of a diversified housing stock by establishing land use controls which are inherently exclusionary and which bear no substantial relationship to any legitimate zoning purpose.
Without purporting to exhaust the list of zoning devices which are presumptively objectionable, I would note that minimum house size requirements which bear no substantial relationship to health needs[19] and requirements as to the minimum or maximum number of bedrooms which a dwelling unit may contain, cf. Molino v. Glassboro, 116 N.J. Super. 195 (Law Div. 1971), are presumptively invalid. Zoning for excessively large lots and large frontages presents more difficult analytic problems, cf. Steel Hill Development, Inc. v. Sanbornton, 469 F.2d 956 (1 Cir.1972), but excessive mapping for such lots is, absent extraordinary environmental factors, also presumptively invalid. Cf. Williams & Norman, supra at 496-97.
These obligations, too, are judicially enforceable, albeit without need for the more elaborate procedures appropriate for litigation concerning developing and developed areas which are discussed above.

*220 V
The problems we begin to face today are of awesome magnitude and importance, both for New Jersey and for the nation as a whole. It will not do to approach them gingerly; they call out for forceful and decisive judicial action.
The flow of low and moderate income persons is toward urban areas, but the cities have neither the space nor the resources to house these people. The question is whether the suburbs will act to accommodate this growth in an orderly way or will simply and blindly resist. Two well-entrenched zoning objectives, low density land use and favorable fiscal balance, though sometimes at odds with each other, have on the whole cooperated to create a milieu of discriminatory zoning which threatens to make the next 30 years of suburban growth a disaster.
The shape of the possible disaster can now be foreseen. The inevitable alternative to assumption by suburban communities of an obligation to provide for their fair share of regional housing needs is an increase in the size of slums with all their attendant miseries. The consequences of such economic, social, and racial segregation are too familiar to need recital here. See Nat'l Advisory Comm'n on Civil Disorders, Report (1968). Justice must be blind to both race and income.
It is not the business of this Court or any member of it to instruct the municipalities of the State of New Jersey on the good life. Nevertheless, I cannot help but note that many suburban communities have accepted at face value the traditional canard whispered by the "blockbuster": "When low income families move into your neighborhood, it will cease being a decent place to live." But as there is no difference between the love of low income mothers and fathers and those of high income for their children, so there is no difference between the desire for a decent community felt by one group and that felt by the other. Many low income families have learned from necessity the desirability of community involvement *221 and improvement. At least as well as persons with higher incomes, they have learned that one cannot simply leave the fate of the community in the hands of the government, that things do not run themselves, but simply run down.
Equally important, many suburban communities have failed to learn the lesson of cultural pluralism. A homogeneous community, one exhibiting almost total similarities of taste, habit, custom and behavior is culturally dead, aside from being downright boring. New and different life styles, habits and customs are the lifeblood of America. They are its strength, its growth force. Just as diversity strengthens and enriches the country as a whole, so will it strengthen and enrich a suburban community. Like animal species that over-specialize and breed out diversity and so perish in the course of evolution, communities, too, need racial, cultural, social and economic diversity to cope with our rapidly changing times.
Finally, many suburban communities have failed to recognize to whom the environment actually belongs. By environment, I mean not just land or housing, but air and water, flowers and green trees. There is a real sense in which clean air belongs to everyone, a sense in which green trees and flowers are everyone's right to see and smell. The right to enjoy these is connected to a citizen's right to life, to pursue his own happiness as he sees fit provided his pursuit does not infringe another's rights.
The people of New Jersey should welcome the result reached by the Court in this case, not merely because it is required by our laws, but, more fundamentally, because the result is right and true to the highest American ideals.
MOUNTAIN and PASHMAN, JJ., concurring in the result.
For modification  Chief Justice HUGHES and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD  7.
Opposed  None.
NOTES
[1] The judgment stayed the declaration of invalidity of the zoning ordinance until the court should decide "that sufficient time has elapsed to enable the municipality to enact new and proper regulations." The other provisions of the judgment were stayed pending appeal by subsequent order of the trial court.
[2] "Low income" was used in this case to refer to those persons or families eligible, by virtue of limited income, for occupancy in public housing units or units receiving rent supplement subsidies according to formulas therefor in effect in the area. "Moderate income" was similarly used to refer to those eligible for occupancy in housing units receiving so-called Section 235 or 236 or like subsidies. In another case, Oakwood at Madison v. Township of Madison, 128 N.J. Super. 438, 445 (Law Div. 1974), the figures of income up to $7,000 a year for the first category and up to $10,000-$12,000 for the second were projected. While the formula figures vary depending on family size, the dollar amounts mentioned are close enough to represent the top income in each classification for present purposes. "Middle income" and "upper income" are the designations of higher income categories.
[3] Plaintiffs fall into four categories: (1) present residents of the township residing in dilapidated or substandard housing; (2) former residents who were forced to move elsewhere because of the absence of suitable housing; (3) nonresidents living in central city substandard housing in the region who desire to secure decent housing and accompanying advantages within their means elsewhere; (4) three organizations representing the housing and other interests of racial minorities. The township originally challenged plaintiffs' standing to bring this action. The trial court properly held (119 N.J. Super. at 166) that the resident plaintiffs had adequate standing to ground the entire action and found it unnecessary to pass on that of the other plaintiffs. The issue has not been raised on appeal. We merely add that both categories of nonresident individuals likewise have standing. N.J.S.A. 40:55-47.1; cf. Walker v. Borough of Stanhope, 23 N.J. 657 (1957). No opinion is expressed as to the standing of the organizations.
[4] The validity of cluster zoning and of particular ordinance provisions, including, as here, those requiring the dedication of open space for public uses, has never been passed upon by this court. See generally 2 Williams, supra, §§ 47.02, 47.03, 47.05.
[5] The ordinance was held, in a taxpayer's suit, to be unconstitutional under the zoning section of the state constitution (Art. IV, sec. VI, par. 2) and violative of the general zoning enabling act (N.J.S.A. 40:55-30 et seq). Rudderow v. Township Committee of Mount Laurel Township, 114 N.J. Super. 104, decided in March 1971 by the same judge who determined the instant case. His judgment was reversed by the Appellate Division in December 1972, 121 N.J. Super. 409, after the ordinance had been repealed and the instant case heard and decided at the trial level. This court has never passed upon the PUD enabling legislation, any local implementing ordinance or any municipal approval of a PUD project. The basic legal questions involved in Rudderow, which include among others the matter of what requirements a municipal authority may, in effect, impose upon a developer as a condition of approval, are serious and not all easy of solution. We refer to the Mount Laurel PUD projects as part of the picture of land use regulation in the township and its effect. It may be noted that, at a hearing on the PUD ordinance, the then township attorney stated that "* * * providing for apartments in a PUD ordinance in effect would seem to overcome any court objection that the Township was not properly zoning in denying apartments."
[6] The current township attorney, at oral argument, conceded, without specification, that many of these various conditions which had been required of developers were illegal.
[7] This court has not yet passed on the validity of any land use regulation which restricts residence on the basis of occupant age.
[8] The record is replete with uncontradicted evidence that, factually, low and moderate income housing cannot be built without some form of contribution, concession or incentive by some level of government. Such, under various state and federal methods, may take the form of public construction or some sort of governmental assistance or encouragement to private building. Multi-family rental units, at a high density, or, at most, low cost single-family units on very small lots, are economically necessary and in turn require appropriate local land use regulations.
[9] Such "finances and resources" has reference to monies spent by various agencies on highways within the municipality, loans and grants for water and sewer systems and for planning, federal guarantees of mortgages on new home construction, and the like.
[10] While, as the trial court found, Mount Laurel's actions were deliberate, we are of the view that the identical conclusion follows even when municipal conduct is not shown to be intentional, but the effect is substantially the same as if it were.
[11] The paragraph reads:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
[12] Zoning ordinance restriction of housing to single-family dwellings is very common in New Jersey. Excluding six large, clearly rural townships, the percentage of remaining land zoned for multi-family use is only just over 1% of the net residential land supply in 16 of New Jersey's 21 counties (not included are Atlantic, Cumberland, Cape May, Salem and Hudson counties). See Land Use Regulation, The Residential Land Supply, supra, pp. 10-13. (It is well known the considerable numbers of privately built apartments have been constructed in recent years in municipalities throughout the state, not allowed by ordinance, by the use variance procedure. N.J.S.A. 40:55-39(d). While the special exception method, N.J.S.A. 40:55-39(b), is frequently appropriate for the handling of such uses, it would indeed be the rare case where proper "special reasons" could be found to validly support a subsection (d) variance for such privately built housing.) Pennsylvania has held it unconstitutional for a developing municipality to fail to provide for apartments anywhere within it. Appeal of Girsh, 437 Pa. 237, 263 A.2d 395 (1970).
[13] Some authorities suggest that such dwellings are rapidly becoming financially possible only for those of relatively high income. See New Jersey Trends, ch. 24, Sternlieb, Introduction: Is This The End of the American Dream House?, p. 302 (Institute for Environmental Studies, Rutgers University, 1974).
[14] Apartment bedroom restrictions are also common in municipalities of the state which do allow multi-family housing. About 60% of the area zoned to permit multi-family dwellings is restricted to efficiency or one-bedroom apartments; another 20% permits two-bedroom units and only the remaining 20% allows units of three bedrooms or larger. See Land Use Regulation, The Residential Land Supply, supra, pp. 11-12.
[15] For a full report on the fiscal aspects of multi-family housing, see New Jersey County & Municipal Government Study Commission, Housing & Suburbs, Fiscal & Social Impact of Multifamily Development (1974).
[16] These restrictions are typical throughout the state. As shown in Land Use Regulation, The Residential Land Supply, supra, pp. 14-16, in the 16 counties covered by that study, only 14.1% of the available single-family land is allowed to be in lots of less than one-half acre, only 5.1% (and that mostly in urban counties) in those of less than 10,000 square feet, and 54.7% of it requires lots of from one to three acres.

The same study, pp. 17-18, demonstrates that only as to 13.5% of the available single-family land is a frontage of less than 100 feet required, 32.2% requires 100-149 feet, 23.3%, 150-199 feet and 31%, 200 feet or more.
[17] Minimum floor area requirements exist as to all but 8% of the available residential land supply in the 16 counties studied in Land Use Regulation, The Residential Land Supply, supra, pp. 18-20; the Mount Laurel dimensions are representative of those most commonly imposed.
[18] Land Use Regulation, The Residential Land Supply, supra, pp. 6-8, shows that in the 16 county area only 14.7% of the net land supply is zoned for industrial uses (including offices and research laboratories). 3.6% is zoned for commercial uses and the remainder (81.7%) for residential uses of all types.
[19] The township has not been deprived of the opportunity to present its defense on this thesis, since the case was very thoroughly tried out with voluminous evidence on all aspects on both sides.
[20] This case does not properly present the question of whether a developing municipality may time its growth and, if so, how. See, e.g., Golden v. Planning Board of the Town of Ramapo, 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291 (1972), appeal dismissed 409 U.S. 1003, 93 S.Ct. 436, 440, 34 L.Ed.2d 294 (1972); Construction Industry Association of Sonoma County v. City of Petaluma, 375 F. Supp. 574 (N.D. Cal. 1974), appeal pending (citation of these cases is not intended to indicate either agreement or disagreement with their conclusions). We now say only that, assuming some type of timed growth is permissible, it cannot be utilized as an exclusionary device or to stop all further development and must include early provision for low and moderate income housing.
[21] This was said with the realization that most of such housing will require some form of governmental subsidy or assistance at some level to construct and, if the present tax structure remains unchanged, perhaps also some assistance to the municipality itself in connection with the furnishing of the additional local services required. See recommendations, Housing & Suburbs, Fiscal & Social Impact of Multifamily Development, supra, pp. 123, et seq.

We further agree with the statement in the separate summary of the cited study, p. 2: "We recognize that new development, whatever the pace of construction, will never be the source of housing for more than a small part of the State's population. The greater part of New Jersey's housing stock is found and will continue to be found in the central cities and older suburbs of the State * * *." (Substantial housing rehabilitation, as well as general overall revitalization of the cities, is, of course, indicated.) So, while what we decide today will produce no mass or sudden emigration of those of low and moderate income from the central cities and older suburbs to the developing municipalities, our conception of state law as applied to land use regulation affecting housing requires that the fair opportunity therefor be afforded at once, with the expectation and purpose that the opportunity will come to fruition in the near future through private or public enterprises, or both, and result in available housing in the developing municipalities for a goodly number of the various categories of people of low and moderate income who desire to live therein and now cannot.
[22] This court long ago pointed out "* * * the unreality in dealing with zoning problems on the basis of the territorial limits of a municipality." Duffcon Concrete Products, Inc. v. Borough of Cresskill, supra (1 N.J. at 513). It is now clear that the Legislature accepts the fact that at least land use planning, to be of any value, must be done on a much broader basis than each municipality separately. Note the statutes establishing county planning boards, with the duty to prepare a county master plan and requiring that board's review and approval of certain subdivisions, N.J.S.A. 40:27-1 to 8; authorizing voluntary regional planning boards, N.J.S.A. 40:27-9 to 11; creating state planning and coordinating functions in the Department of Community Affairs and its Division of State and Regional Planning, N.J.S.A. 52:27D-6 and 9 and 13:1B-5.1 and 15.52; and providing for New Jersey to join with New York and Connecticut in the establishment of the Tri-State Regional Planning Commission with extensive area planning functions, N.J.S.A. 32:22B-1, et seq. (Federal statutes and regulations require many federal grants for local public works and installations to have the approval of regional planning agencies, consistent with comprehensive area plans.) Authorization for regional zoning  the implementation of planning , or at least regulation of land uses having a substantial external impact by some agency beyond the local municipality, would seem to be logical and desirable as the next legislative step.
[23] The questions mentioned in this paragraph are more fully involved in Oakwood at Madison v. Township of Madison, supra, 128 N.J. Super. 438, appeal pending unheard in this court.
[1] Hereinafter cited as Building the American City and The Residential Land Supply, respectively.
[2] Defendant contends that no such motivation is at work in this case. I, like my brethren, accept that claim.
[3] The Department of Community Affairs surveyed the use of exclusionary devices in municipal zoning laws as of 1970. The study area included all developable land in New Jersey except that in Atlantic, Cape May, Cumberland, Hudson, and Salem Counties and in the Hackensack Meadowlands District. The Residential Land Supply, supra. All figures in this opinion as to the extent of use of various zoning provisions are based on that study. For other analyses of Department of Community Affairs data, see Special Message to the Legislature by Governor Cahill, A Blueprint for Housing in New Jersey, Dec. 7, 1970; Williams & Norman, "Exclusionary Land Use Controls: The Case of North-eastern New Jersey," 22 Syracuse L. Rev. 476 (1971); Sagalyn & Sternlieb, Zoning and Housing Costs, 93-115 (1972); Nat'l Comm. Against Discrimination in Housing, Jobs and Housing: Final Summary Report on the Housing Component, supra at 25-37.
[4] The extreme case is Morris County, where 87% of the land zoned for single family housing had a 1,200 square foot minimum floor space requirement and 66.3% had a 1,600 square foot or more minimum. In Burlington, only 54.7% was zoned for 1,000 square feet or more and 24% had no minimum house size requirement at all.
[5] The term "outer-ring" is used here in the same sense as it is used in the majority opinion, ante at 162. See Williams & Norman, supra at 479. It should be noted that this term is not used consistently by professional planners. The Regional Plan Association, the principal New York planning group, describes the counties referred to here as "outer-ring" counties as the "intermediate ring," reserving the former term for more outlying areas, Sussex, Warren, Hunterdon, and Ocean. Clawson, supra at 368. The Delaware Valley Regional Planning Commission, the principal Philadelphia planning group, does not describe suburban development in the Philadelphia region in terms of concentric "rings" at all, perhaps because development in that region has been more blotchy. Id. at 291.
[6] This concededly is an oversimplified measure, see Williams & Norman, supra at 481 n. 13, but one widely used by persons in the housing construction industry. The Residential Land Supply, at 18. The $20 figure was considered conservative at the time of publication of the Department of Community Affairs study in 1972. Id.
[7] The communities are Lamberton Township (Burlington); Winslow Township (Camden); Franklin Township (Gloucester); Plumstead Township (Ocean); Montague Township (Sussex); Allamuchy Township (Warren). All are distant from the path of development and rural in character.
[8] It should be noted that despite these restrictions a significant amount of multifamily housing has been built in the suburbs in recent years. Thus, even in Somerset County, which had no vacant land zoned for multifamily dwellings during the period between 1960 and 1970, 7,635 multifamily units were built in those 10 years. This seems to have been achieved through variances and specially procured zoning ordinance amendments. Such individually negotiated variances and amendments, however, have usually been accompanied by formal or informal restrictions limiting development to small high-rent units, which are wholly unsuited to the needs of families with low or moderate incomes. Nat'l. Comm. Against Discrimination in Housing, Jobs and Housing: Final Summary Report on the Housing Component, supra at 35-37.
[9] Here, too, Winslow, Franklin, Plumstead, and Montague Townships are aberrant and not included.
[10] In a few municipalities in Gloucester and Burlington Counties mobile homes are permitted in some nonresidential use areas. In a few localities scattered through the State, mobile homes are permitted as conditional uses. The Residential Land Supply, supra at 13; Williams & Norman, supra at 488-89.
[11] Hereinafter cited as Housing Crisis in New Jersey.
[12] As the term is used by the Regional Planning Association, which includes much of northern New Jersey.
[13] As of 1971, 96% of all municipalities in New Jersey had zoning ordinances and 85% had subdivision controls. Sagalyn & Sternlieb, Zoning and Housing Costs 102 (1972). We need not consider here the affirmative duties of a municipality which once had but has now abandoned zoning or subdivision regulations.
[14] While this opinion is principally directed towards municipalities, the same considerations also apply to planning at the county level when the county has chosen to exercise power to regulate land use permitted it by N.J.S.A. 40:27-1 et seq.
[15] It should be emphasized that citation of these cases and statutes is not intended to indicate approval of the specific zoning provisions approved therein.
[16] Relevant considerations might include: the area included in the interdependent residential housing market; the area encompassed by significant patterns of commutation; the area served by major public services and facilities, e.g., parks, hospitals, cultural facilities, etc.; the area in which the housing problem can be solved. All of these considerations must be evaluated in terms of both present facts and projections of future development.
[17] The following factors were considered in developing a fair share plan for the Dayton, Ohio area:

[T]he needed low and moderate income dwelling units were assigned to the planning units using a composite of numbers resulting from six calculation methods: (1) equal share; (2) proportionate share of the county's households; (3) proportionate share of the county's households making less than $10,000 annually (or less than $7,000 in the three more rural counties); (4) the inverse of #3; (5) a share based on the assessed valuation per pupil of the school districts covering the planning units; and (6) a share based on the relative over-crowding of the school districts involved.
* * *
The six factors used in the calculations, however, seemed to reflect some very basic determinations: the possibility of each sub-area being treated equally, the existing distribution of each county's households and lower income households, and two indicators of the receiving school districts' ability to accept new students. The latter two were used because the school question emerged as a critical concern whenever low and moderate income housing was mentioned for placement in a given area.
[Bertsch & Shafer "A Regional Housing Plan: The Miami Valley Regional Planning Commission Experience," 1 Planners Notebook No. 1 (1971) quoted in Williams, supra § 66.36.]
[18] In 1970 the Department of Community Affairs, in its study, Housing Crisis in New Jersey 1970, reported that 13.9% of the dwelling units in Cape May County were substandard, 32.8% in Cumberland, 34.7% in Salem, 16.9% in Atlantic, 19.5% in Sussex, and 23.2% in Warren. All of the counties have significant populations near or below the poverty level. Id.
[19] Unjustifiable minimum house size requirements should, of course, be distinguished from housing code minimum space requirements which bear a real and substantial relationship to health needs. Sente v. Clifton, 66 N.J. 204, 209 (1974) (Pashman J. dissenting); Building the American City, supra at 215 n. 19.